## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| **CYNTHIA WETZEL**, on behalf of herself and all other New Mexico consumers similarly situated**,** <br><br> Plaintiff**,** <br><br> **v.** <br><br> **DIESTEL TURKEY RANCH** <br><br> Defendant. | **Case No.: 20-cv-1213** <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Cynthia Wetzel ("Plaintiff"), by and through her undersigned attorneys, brings this action on behalf of herself and all others similarly situated, based upon personal knowledge as to herself and her activities, and on information and belief as to all other matters against Defendant Diestel Turkey Ranch ("Defendant" or "Diestel"), and alleges as follows:

## <u>NATURE OF THE CASE</u>

1.      This is a consumer class action against Defendant Diestel Turkey Ranch, which markets and sells premium-priced turkey products (collectively the "Turkey Products" listed below) nationwide through retailers such as Whole Foods and Amazon.com.

2.      The label of each Diestel turkey product (like that pictured below) and Diestel's online advertising uniformly state that Diestel's turkeys originate from its idyllic, family-run turkey ranch in Sonora, California (the "Sonora Ranch"), where turkeys are represented to be, among other things, "[t]houghtfully raised on sustainable family farms with plenty of fresh air and space to roam [and] are given individual care and a wholesome diet," "slow grown," and Diestel workers reportedly "walk the flock every day." Defendant invites the public to visit the

Sonora Ranch to see the turkeys and conditions for themselves. Diestel's representations indicate to consumers that its turkeys are not raised on typical factory farms.



3.      To further bolster its representations that its turkeys are from its Sonora Ranch, not from typical industrial farms, Defendant also represents that its turkeys are raised in conformance with the highest animal welfare standards under the Global Animal Partnership ("GAP") Animal Welfare Certified program. The GAP scale, which ranges from one to five, indicates how closely the conditions under which an animal was raised mimic the animal's natural environment, with five being the best, which helps consumers distinguish products that are from factory farms and those that are not.   Defendant markets its Turkey Products as

coming from turkeys raised in a manner consistent with either GAP "Animal Welfare Rating 3 Enhanced Outdoor Access" or "Animal Welfare Rating 5+ Animal Centered" standards. Defendant widely advertises its Turkey Products as meeting high levels of GAP animal welfare certification standards, despite raising a large proportion of its turkeys in a manner that fails, in numerous significant respects, to meet even the lowest tier of GAP's certification standards.

4.      Additionally, Diestel Turkey Ranch in Sonora, California is a turkey processing company that sources the overwhelming majority of its turkeys from growers outside of Sonora, California, at typical factory farms (the "Off-Site Facilities"), where turkeys are raised in large, overcrowded metal sheds that lack sufficient space to engage in natural behaviors and are often mired in manure and slaughterhouse waste   — *i.e.*, not ranches or ranch-like conditions depicted at the Sonora Ranch.  Furthermore, despite widely advertising its Turkey Products as meeting high level animal welfare and GAP certification standards, Diestel raises a large proportion of its turkeys in a manner that fails, in numerous significant respects, to meet even the lowest tier of GAP's certification standards.

5.      Each of Defendant's misrepresentations creates an overall marketing scheme that misleads the public as to the origin of Diestel's Turkey Products, including the conditions under which the turkeys are raised. The use of factory farming techniques means that Defendant's turkeys commonly suffer from, among other things, overcrowding, illness, injury, pain, filth, excessive confinement, lack of enrichment, and premature death.

6.      Defendant knows that consumers care about animal welfare, and are willing to pay extra money for products that they believe come from animals that were raised outdoors on a family-run ranch, where they were treated "thoughtfully" as Defendant represents with "plenty of room to roam" and "fresh air" – in other words not from a typical industrial farm. Defendant exploits the growing consumer demand for non-factory farmed, humanely raised[1] animal products through these misrepresentations, that are intended to induce consumers to pay

---

[1] Defendant previously represented its Turkey Products as "Humanely Raised." Upon information and belief, this phrase was only phased out in favor of "Thoughtfully Raised." Defendant's interchangeable use of these phrases capitalizes on the widespread consumer confusion over the meanings of these and similar marketing claims.

significant premiums for Diestel's Turkey Products that consumers reasonably believe come from turkeys that were "thoughtfully raised" on the Diestel family's Sonora Ranch.

7.        Although there is a labeling process involving the USDA, internal reporting has indicated how unreliable these meat and poultry labels are. An excerpt from executive summary of the USDA OIG report states:

> "As a result, meat, poultry, and egg product labels may reflect inaccurate statements and claims made by establishments. Additionally, there is reduced assurance that establishments' generic labels meet requirements. Based on our sample results, we estimated that approximately 2,038 (15.00 percent) of the approved required labels and 161 (18.34 percent) of the approved generic labels may have one or more exceptions."[2]

8.        As a result of Defendant's misrepresentations about its turkey products from the Sonora Ranch, consumers paid more for Diestel Turkey Products and suffer harm in the form of paying a higher price for them than they would have paid if they had known that Diestel turkeys were raised at the agro-industrial Offsite Facilities.

9.        Plaintiff brings this class and private attorney general action against Defendant, on behalf of herself and the proposed classes, in order to seek damages and injunctive relief for Defendant's false and misleading representations regarding its turkey products. Defendant's misrepresentations constitute violations of the New Mexico Unfair Practices Act § 57-12-1, *et seq.* ("UPA") and New Mexico's False Advertising Law, § 57-15-1, *et seq.* ("FAL").

## **PARTIES**

10.        Plaintiff Cynthia Wetzel is a resident of Santa Fe, New Mexico and has been at all material times.

11.        Plaintiff went to Whole Foods Market on Cerrillos Road in Santa Fe, New Mexico in approximately November 2018 to purchase a turkey for her family's Thanksgiving meal.

---

[2] https://www.usda.gov/sites/default/files/audit-reports/24601-0002-23.pdf

12.    Plaintiff chose to shop for the turkey at Whole Foods because of Plaintiff's knowledge of Whole Foods animal rating system. Plaintiff viewed the signs in the Whole Foods meat department regarding the store's commitment to high animal welfare standards, and Plaintiff believed that Whole Foods was selling products that satisfied those standards. At the time of the purchase, Plaintiff believed that Whole Foods sold a better product and that animals sold at Whole Foods were treated better than animals sold at other grocery store retailers.

13.    Plaintiff intended to purchase a turkey that had been humanely raised, a turkey that had been happy during its life, and a turkey raised in a good environment.

14.    Plaintiff cannot purchase meat marketed as from humanely and happily raised animals at all times, but chose to do so for Thanksgiving because of the importance of the family holiday meal. For previous Thanksgiving holiday meals such as in 2017, Plaintiff's budget did not allow her to buy a turkey with a rating.

15.    Plaintiff's budget did not allow her to purchase the most expensive turkey available at Whole Foods in 2018 either; instead she purchased the best one that she could given her budget that year. Plaintiff remembers that the turkey that she purchased to be priced approximately twice as much as other turkeys available at Whole Foods that were not marketed as humanely, happily raised turkeys.

16.    Plaintiff believed that the turkey that she purchased in 2018 was a humanely, happily raised turkey because of the rating system number applied to the turkey, which corresponded to the rating system information available in the store.

17.    Plaintiff believed that she could feel better about herself for purchasing a turkey that had a higher animal welfare rating than a turkey that did not have promises that the turkey was humanely and happily raised.

18.    Plaintiff relied on both Whole Foods and Diestel's representations regarding high animal welfare standards in deciding on which turkey product to purchase and how much to pay.

19.    Plaintiff purchased a Diestel Turkey product, brought it home, and took a photo of the product in her kitchen sink, photo reproduced here:



20.     Plaintiff was misled and deceived by the representations made by Whole Foods and Diestel regarding the rating system for animals sold at Whole Foods and rating on the actual product.

21.     If Plaintiff had known the truth about Whole Foods animal rating system and Diestel's turkeys, Plaintiff would not have bought it at all or would not have paid as much as she did for it.

22.     Plaintiff purchased and paid higher prices for the Diestel turkey products based

on Defendant's representations that its turkeys were from a small, family-run ranch in Sonora, California, including but not limited to, the turkey products being "thoughtfully raised" outside with fresh air – *not* raised in a manner consistent with factory farming. However, many of Diestel's turkeys were in fact raised under typical factory farm conditions at Off-site Facilities. Had Plaintiff, and other Class members, known the truth that Diestel's turkey were not raised at the Sonora Ranch, they would not have purchased those products, or would not have paid the inflated prices for them. If Diestel were to disclose the truth about its Turkey Products, consumers, including Plaintiff, would be better able to make an informed choice about whether to purchase them at the prices offered. Plaintiff would be interested in buying another Diestel Turkey Product that is truthfully advertised with animal welfare claims consistent with not being from a factory farm.

23.     Defendant Diestel Turkey Ranch is a California corporation with a principal place of business located at 22200 Lyons Bald Mountain Road, Sonora, California 95370. It sells, or during the applicable statute of limitations has sold, its Turkey Products in New Mexico and across the country online (through its website and Amazon) and through major retailers like Whole Foods Markets.

24.     Plaintiff alleges, on information and belief, that at all relevant times Defendant's agents, employees, representatives, executives, directors, partners, and/or subsidiaries were acting within the course and scope of such agency, employment, and representation on behalf of Defendant.

## JURISDICTION AND VENUE

25.     Diversity subject matter jurisdiction exists over this class action pursuant to the Class Action Fairness Act of 2005, Pub. No. 109-2, 119 Stat. 4 (2005), amending 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions involving: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from some defendants; and (c) where the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28

U.S.C. § 1332(d)(2) and (6).

26.      While the exact number of members in the proposed class is unknown at this time, Plaintiff has reason to believe that thousands of consumers purchased Defendant's Turkey Products throughout New Mexico and the United States during the relevant time period. The number of class members could be discerned from the records maintained by Defendant.

27.      While the exact damages to Plaintiff and the members of the classes are unknown at this time, Plaintiff reasonably believes that their claims exceed five million dollars ($5,000,000) in the aggregate.

28.      This Court has personal jurisdiction over the parties in this case. Plaintiff resides in this District, purchased Turkey Products in this District, and was injured thereby in this District.  Further, by filing this Complaint, Plaintiff consents to this Court having personal jurisdiction over her. Defendant, a citizen of California, is authorized to, and in fact does, conduct substantial business in New Mexico, including in this District, where Plaintiff purchased its products. Defendant purposefully avails itself of the laws of New Mexico to market, promote, distribute, and sell the Turkey Products to consumers in New Mexico and this District.

29.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District and because Defendant:

> (a) has intentionally availed itself of the laws and markets within this District through the promotion, marketing, distribution and sale of its products in this District;
>
> (b) does substantial business in this District; and
>
> (c) is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

30.      Defendant sells or, during the applicable statute of limitations, has sold, its Turkey Products in New Mexico and across the country online (through its website and

Amazon) and through major retailers like Whole Foods Markets.

31.     Defendant Diestel Turkey Ranch processes, distributes, and sells turkey products in the United States including the following (referred to collectively here as the "Turkey Products"):

- Naturally Smoked Whole Turkey;
- Naturally Oven Roasted Whole Turkey;
- Organic Oven Roasted Whole Turkey;
- Organic Heirloom Whole Turkey;
- Organic Whole Turkey;
- Low Sodium Oven Roasted Turkey Breast;
- Organic Roasted Turkey Breast;
- Organic Honey Roasted Turkey Breast;
- Organic Pre-Sliced Smoked Turkey;
- Organic Pre-Sliced Oven Roasted Turkey;
- Diestel Non-GMO Project Verified Young Turkey;
- Original Diestel Turkey;
- Petite Turkey;
- Diestel Turkey Chorizo;
- Fully Cooked Drums and Thighs;
- Natural Burgers;
- Boneless Young Turkey Roast;
- Heidi's Hens Organic Breast Roast;
- Diestel Ground Turkey
- Bone-In Breasts Young Turkey Breast; and
- Brined Turkey Breast.[3]

---

[3] Discovery may indicate that additional products should be included within the scope of this Complaint, and Plaintiff reserves the right to add those products.

**A.      Diestel's Sonora Ranch Representations Are Likely to Deceive Reasonable Consumers Into Thinking That Diestel Has One, Idyllic Location Where It Raises Its Turkeys. In Reality, Diestel Raises Less Than 1% of the Turkeys in These Picturesque Conditions.**

32.      Defendant's packaging for the Turkey Products, and on its website, uniformly and consistently state on the principle display panels of the product labels that they are from the "Diestel Turkey Ranch" "family farm" in Sonora, California. The packaging for the Turkey Products further bolsters the representation that Diestel turkeys are not from a typical industrial, factory farm by stating that the turkeys are, among other things, "thoughtfully raised" with "plenty of room to roam" and "fresh air," "Diestel turkeys are slow grown," and "Family Secret #1 [is to] Walk the flock each day."

33.      Defendant has promoted "A Family-Run Sustainable Ranch" on its website[4] and encourages consumers to visit to the Sonora Ranch. On its website during the class period, Defendant promoted the "family-run ranching tradition" of "free-range turkeys from our beautiful ranch in the Northern California foothills."[5]



34.      Diestel advertising brochures have been available at Whole Foods stores across the country without the need to purchase any products. Defendant references and pictures only the Sonora Ranch, "a family run sustainable ranch." The leaflet includes imagery of turkeys

---

[4] The images of Defendant's website appeared during the applicable class period.  However, at a certain point during the pendency of the previous case against Defendant and during the class period, Defendant removed many representations depicted here.

[5] Diestel Turkey Ranch, http://diestelturkey.com/; Farms of Tuolumne County, Diestel Family Turkey Ranch,  https://farmsoftuolumnecounty.org/farms/diestel-family-turkey-ranch/  (last visited August 5, 2019) ("Feel free to come by and visit the ranch and our onsite salesroom.")

grazing freely on green pastures, accompanied by the text "Slow Grown Turkeys from the Diestel Family Ranch." In the leaflet, Defendant recites its alleged belief that "turkeys should be raised in the most natural environment possible," alongside images of grazing turkeys. The representations and imagery in this leaflet are consistent with similar representations and imagery on Defendant's website, which focus on the idyllic Sonora Ranch and the conditions there in order to demonstrate to consumers that Diestel's turkeys are not from a factory farm and are treated with high animal welfare standards.



## We don't rush our farming practices, and quality is never left to chance

 

**We're committed to** to farming practices that are respectful to the animals and land and result in a wholesome turkey. Our birds live in harmony with the environment, and we allow them to grow slowly and naturally, with plenty of room to roam on our ranches.

To produce the highest-quality, most delicious turkeys for you and your family, our birds are fed the finest U.S-sourced grain. We feed a 100% vegetarian diet, and we never administer growth stimulants or antibiotics. Diestel turkeys are tender and juicy with that real old-fashioned flavor, and our products never contain any artificial ingredients. Our turkeys and deli meats are gluten free, and the majority of our turkey products contain no gluten.

You can be assured that all of our products, both organic and all-natural, are produced under our strict animal welfare standards.

**For us, sustainable isn't a trend - it's a way of life**

In everything we do—from raising our turkeys to managing our ranches– we're committed to sustainable practices. We oversee all aspects of farming, processing, and production, which results in the consistently premium Diestel turkey that you and your family have come to trust.

**You make it possible**

Our customers are the heart and soul of our business, and we are so honored that you value our family's efforts and our cause. By supporting a sustainable family farm such as ours, you are helping to make a positive impact on the environment and our food system. We welcome and value your input and feedback.

We've been raising turkeys on our sustainable ranch since 1949. 



35.     Defendant's representations carry over to advertisements with retailers, such as this one for Bi-Rite Market, in which Defendant gives the impression that all turkeys are from the Sonora Rach and are "range grown, never caged."



36.     Defendant's advertising gives reasonable consumers the false impression that all of the Turkey Products are made from turkeys that were "Thoughtfully Raised" on the Sonora Ranch.

37.     Upon information and belief, Defendant sends its turkeys to the Sonora Ranch **only for slaughter and processing**. Some turkeys never make it to Sonora Ranch at all and are slaughtered and processed far away from Sonora and outside California, at the conclusion of lives spent in deplorable conditions at Off-Site Facilities.[6]

38.     In contrast to its representations to consumers, Defendant admitted to government regulators, as detailed in a 2013 California Regional Water Quality Control Board

---

[6] Upon information and belief, the Sonora Ranch houses a five-acre processing facility, a slaughterhouse, and wastewater treatment plant.

report on the Sonora Ranch, that it "raise[d] several hundred chickens and turkeys [at the Sonora Ranch] for **non-commercial** purposes. **Commercial turkeys are raised off-site and delivered by truck to the Ranch for processing**."[7]

39.     Upon information and belief, Defendant slaughters approximately 2 million turkeys each year.

40.     According to California Regional Water Quality Control Board, Defendant's turkeys originate from Off-Site Facilities, even though they may end up at the Sonora Ranch for slaughter.

41.     On November 23, 2015, the *Wall Street Journal* and *Washington Post* reported on a nine-month undercover investigation of Defendant (the "Investigation").[8]   The Investigation included extensive footage of Sonora Ranch as well as a second facility owned and operated by Defendant in the city of Jamestown in Tuolumne County, California ("Jamestown Facility").

42.     Upon information and belief, the Jamestown Facility is an agro-industrial operation with approximately 26 poultry barns, warehousing anywhere from 7,000 to 17,000 Diestel Turkeys per barn.

43.     The Jamestown Facility and other similar large scale, agro-industrial operations run by Defendant are materially different from what Defendant leads the public to believe about its purportedly idyllic Sonora Ranch. These google earth images show the visual, stark difference[9]:

---

[7] California Regional Water Quality Control Board, http://www.waterboards.ca.gov/centralvalley/board_decisions/adopted_orders/tuolumne/r5-2013-0112.pdf (2013) (emphasis added).
[8] Wall Street Journal, "Video Shows Abuse at Whole Foods Turkey Supplier, Activists Say" (Nov. 23, 2017), http://www.wsj.com/articles/video-shows-abuse-at-whole-foods-turkey-supplier-activists-say-1448328713.
[9] First: satellite view of Sonora Ranch. Google Earth, https://www.google.com/earth/, captured Jan. 27, 2017. Second: satellite view below of Off-Site Jamestown Facility. Google Earth, https://www.google.com/earth/, captured Oct. 12, 2019.





44.     Defendant's advertising and labeling of the Turkey Products as originating from the Sonora Ranch is false, misleading, and intended to induce consumers to purchase Defendant's Turkey Products, at a premium price, while ultimately failing to meet consumer expectations. These representations deceive and mislead reasonable consumers into believing that the Turkey Products are from the Sonora Ranch, not a typical factory farm, when they are not.

45.     In reality, less than 1% of Diestel's turkeys are raised at the Sonora Ranch. Instead, Diestel sells turkeys from approximately eight off-site facilities and purchases raw material (bird parts) from suppliers outside of Sonora and outside of California and then packages them as Diestel products from Sonora Ranch.

**B.     Diestel's "Thoughtfully Raised" Statements Are Likely to Deceive A Reasonable Consumer Into Thinking That the Turkeys Are Raised in Fresh Air, Roam Outdoors in Fields, and Receive Individual Care. In Reality, Turkeys Live in Sheds with Thousands of Other Birds and "Care" is Culling Sick and Dead Birds.**

46.     Although Defendant falsely claims that its turkeys are "Thoughtfully Raised with plenty of fresh air and space to roam, whether indoors or outdoors," the turkeys are rarely, if ever, allowed outside the agro-industrial barns where they spend their lives.[10]

47.     In reality, most of Defendant's turkeys are raised in typical commercial poultry barns that house up to 17,000 birds at a single time.

48.     Satellite images of Defendant's turkey barns taken over the turkeys' lifespan indicate that turkeys are not outdoors and not on any range. Instead, the satellite images indicate that the turkeys live and defecate inside the barns.

49.     Upon information and belief, Defendant has allowed the turkeys outside the barns only for staged inspections.[11]

---

[10] Deposition of Kent Larson, at 19-20. When asked whether he saw the turkeys out, Mr. Larson answered, "I have not—in 20 years, the first time I ever saw turkeys out was in May of last year." Mr. Larson continued, "I looked up from my living room. And you'll see in one of the photos, I saw masses of turkeys out, smaller turkeys, out in buildings that I had never seen them out before. And so I was shocked—not shocked but surprised. So I took a photo."

[11] *Id.* at 35:9-13. After explaining that the turkeys were out in October 2016, "then they were never out again," Mr. Larson stated, "Well, if someone was to come along and inspect at that time, everything

50.     Upon information and belief, the California Regional Water Quality Control Board does not freely permit the turkeys to be "Range Grown." The false nature of Defendant's advertising is well-known to the community surrounding Defendant's Off-site Facilities' operations. A neighbor of a Diestel facility located at 10700 La Grange Road, Jamestown, California 95327 (the "Jamestown Facility") states it is "general knowledge" "about what's out here compared to what's being advertised."[12] The neighbor describes the local communication regarding Defendant and its operations as "like just a slight little wink/nod type thing. 'We know what's going on'."[13]

51.     Upon information and belief, and directly contrary to Defendant's advertising and labeling, undercover footage of the Jamestown Facility demonstrates that turkeys used in the Turkey Products are not raised under the highest animal-welfare standards at the Sonora Ranch. To the contrary, Diestel's turkeys are raised in a manner consistent with typical factory farming conditions as evidenced by the following published observations:[14]

- turkeys were raised in over-crowded barns[15];

- turkeys were found languishing or dead;

- turkeys suffered from excessive confinement;

- turkeys were covered in feces;

- turkeys were trapped in feces that covered much of the barn floor, up to one-half foot deep;

- turkeys suffered from swollen-shut eyes, swollen nostrils, open wounds, and/or bruises;

would look normal on those days because everything is out, everything is to the standard. And then when the inspection is over, closed back up and they go back in."

[12] Direct Action Everywhere SF Bay Area is the Plaintiff in a lawsuit filed against Diestel Turkey Ranch in Alameda County Superior Court in January 2017, Case No. RG17847475 ("*Direct Action* Lawsuit"). The nonprofit Plaintiff conducted an undercover investigation at Diestel Turkey Ranch facilities and issued a report titled "A Deadly Feast: What You are Not Told About Your Thanksgiving Turkey." *Direct Action* Lawsuit, Deposition of Kent Larson ("Larson Depo."), at 14:4-5.

[13] *Id.* at 15: 3-5.

[14] Direct Action Everywhere, "A Deadly Feast," http://directactioneverywhere.com/s/A-Deadly-Feast.pdf (last visited July 10, 2019).

[15] A 2014 *Consumer Reports* survey found that 90% of consumers expect that "humanely raised" animals are raised with adequate living space. Animal Welfare Institute, *supra n.2*, at 10.

- turkeys were missing large patches of feathers as a result of pecking one another and/or de-feathering from extreme stress;

- turkeys were routinely subject to debeaking and/or beak-trimming;

- turkeys suffered from grossly inflamed and swollen crops, which are located near a turkey's throat;

- turkeys labored to breathe in an enclosed barn environment dense with ammonia and particles of dried feces and feathers; and

- turkeys were subject to high mortality rates, with as many as 7% of birds in a barn dying in a single week.

*Many Diestel birds missing large portions of feathers, covered with feces, sometimes stuck in feces a half-foot deep, 2015.*



*The turkey pictured below is stuck in manure inside a Diestel barn.*



*Turkeys, pictured below, crowded inside a barn at Diestel's Jamestown facility, 2015. These turkeys were slaughtered and sold as "Thoughtfully Raised" and/or "Humanely Raised."*



*Diestel birds are debeaked, where a portion of the beak is burned off, an inefficient and painful process that in some cases leads to ongoing pain and even death, 2015.*



*Diestel turkeys were sometimes packed so densely that some were helplessly trampled to death, 2015*



52.     Diestel reinforces the representation that its turkeys are raised on the Sonora Ranch, and not on factory farms, by using animal-raising claims, such as "thoughtfully raised" on "sustainable family farms" with "plenty of fresh air" and "room to roam." Consumers are led to believe based on these statements that Diestel's turkeys are raised on the Sonora Ranch and not raised under typical agro-industrial conditions that would not meet these characterizations.

53.     For example, Defendant's website, reproduced in relevant part here, prominently stated in the header that its turkeys are "Thoughtfully Raised" based on the Diestel family's commitment to "sustainable farming" and providing the birds with "plenty of fresh air and space to roam" and "given individual care":

## Thoughtfully Raised

### Sustainable Farming Goes Beyond Our Ranch's Fences

Our family is dedicated to a sustainable method of farming. To us thoughtfully raised means giving the birds plenty of fresh air and space to roam, whether indoors or outdoors. Our turkeys are given individual care and a wholesome diet. In fact, since the founding of our ranch we've been committed to the philosophy that our operation should be managed with a keen focus on the animals, the environment, and the community.



We believe that our farming methodology provides value through applied innovation, increases the quality and nutrient value of our products, and also stands as an inspiration to others, allowing us to make a long-term impact. We take our responsibility as farmers seriously and we partner with others that share our passion for doing things right.

Each day we support natural and organic farming methods that positively impact our farms, animals and community, so that future generations may enjoy the same family farm that started it all back in 1949.

54.     Defendant's website expanded upon the "Thoughtfully Raised" representations, claiming that its turkeys are "Thoughtfully Raised with plenty of fresh air and space to roam, whether indoors or outdoors" and "our turkeys are given individual care" in connection with stating that "we were the first turkey producer in the country to obtain a GAP 5+ Rating."[16]

---

[16] Diestel Turkey Ranch, http://diestelturkey.com/thoughtfully-raised/the-diestel-difference/ (last visited July 10, 2019). The "plenty of fresh air and room to roam" has since been moved to https://diestelturkey.com/we-love-our-birds-and-then-some/ (last visited on July 10, 2019).

**Thoughtfully Raised & Harvested**

Diestel turkeys are thoughtfully raised with plenty of fresh air and space to roam, whether indoors or outdoors. Our turkeys are given individual care and a wholesome diet. In fact, we were the first turkey producer in the country to obtain a GAP 5+ Rating on our Pasture Raised Holiday Turkeys. This is the very highest rating in the GAP system! Our birds are harvested in our own USDA-inspected processing facility, where we have always possessed incredible respect for our animals. Please feel free to give us a call at the ranch if you have any further questions: 209.532.4950.

55.     Defendant's packaging of its Turkey Products also includes these "Thoughtfully Raised" representations, including the Products featured below:





56.     On its website, Defendant posted a video called "Meet the Ranchers," in which it claims that Defendant's practices are different from conventional agriculture:



57.     Defendant creates and posts videos online that give the impression that all of its Turkey Products are range grown. The video below shows Diestel family members outside with turkeys in fields:



58.     Defendant described pasture raising birds without qualification as to which birds are raised this way creating the impression that they are all pasture raised on the Sonora Ranch:

## Pasture Raised Life

It truly doesn't get any better than pasture raised. Under a canopy of oak trees, these birds have it made. Raised slowly on an all vegetarian diet that is supplemented with fresh green pasture every day of their adolescent and adult lives, these turkeys are given no antibiotics or chemicals. Diestel's pasture raised turkeys attained the Global Animal Partnership Step 5 rating, which is the highest rating to date.

59.      Defendant made further explicit representations regarding its care for the turkeys at the Sonora Ranch, such as assertions regarding fresh air, space to roam, outdoor access, and individual care.[17] Defendant asserted on its website, reproduced below, and its product labels that it "walk[s] the flock every day," spends time with birds in the field, and makes sure that the turkeys "have the best environment possible":

**Family Secret #1:** Walk the flock every day. This is a practice, passed down from Great Uncle Ernest, that we have incorporated and refined through the years. We pay close attention to the health of our birds by spending time with them in the fields, observing their behaviors, and making sure that they have the best environment possible.

60.      Diestel's advertising consistently indicates that its turkeys are range grown on the pasture at the Sonora Ranch:



61.      Defendant's advertising of its Turkey Products creates the impression that its turkeys are thoughtfully raised on the Sonora Ranch in compliance with the highest animal welfare standards, including that they are range and slow grown with plenty of fresh air and room to roam.

62.      In reality, birds are raised in crowded sheds with thousands of other birds and the sheds are surrounded by barren land that is not home to outdoor turkeys. The crowding is so intense enough that Diestel conditions the beaks in order to prevent cannibalism. Diestel's contracts with its growers do not have any requirements for thoughtful raising by any definition. Instead of individual care, Diestel's veterinarian visits Diestel's operations only four times a

---

17 Diestel Turkey Ranch, http://diestelturkey.com/thoughtfully-raised/ (last visited Nov. 13, 2017).

year and sees only 2-3 farms per visit and has documented double digit mortality inside the sheds. Walking the flock actually means picking up dead birds to discard them.

**C.      Diestel's Third-Party Certification Statements Are Likely to Deceive Reasonable Consumers Into Thinking that Diestel's Entire Operation Satisfied the Highest Standards. In Reality, Less than 1% of The Birds Enjoy GAP Step 5/5+ Conditions.**

63.      On its website, Defendant represented that it "embraces strict animal welfare practices" and adheres to third party Global Animal Partnership (GAP) animal welfare standards.[18] Defendant also emphasizes "GAP 5+" while making humanely raised and harvested claims. The GAP 5-Step rating system allows turkey products to be rated at Step 1, Step 2, Step 3, Step 4, Step 5, or Step 5+. A turkey producer may produce certain products that do not achieve any GAP Step rating, not even the lowest rating of Step 1. That same turkey producer may also produce turkey products that are rated Step 5+. The standards are determined by GAP and the audits are conducted less than once a year by auditors, who purportedly audit for compliance with GAP's standards for each particular step rating. According to GAP's website, each farm must be audited individually in order to receive a rating rather than a company as a whole.

64.      Diestel emphasizes its GAP Step 5+ rating in its marketing materials, including on Facebook, when describing the animal welfare standards applied to its turkeys including for example its "Thoughtfully Raised" representations[19] creating the impression that all of Diestel's Turkey Products are raised on the Sonora Ranch consistent with GAP 5+ standards.

---

[18]  Diestel Turkey Ranch, http://diestelturkey.com/thoughtfully-raised/global-animal-partnership-ratings/ (last visited Nov. 13, 2017); https://diestelturkey.com/about/the-diestel-difference/ ("we make only choices we'd be proud to talk about—like deciding to become one of the first turkey producers to earn a Global Animal Partnership Step 5 rating") (last visited August 6, 2019).
[19]  *See, e.g.*, http://diestelturkey.com/thoughtfully-raised/the-diestel-difference/ (last visited Nov. 13, 2017).



## Humanely Raised & Harvested

Diestel turkeys are raised sustainably and humanely with plenty of room both indoors and outdoors. In fact, we were the first turkey producer in the country to obtain a GAP 5+ Rating. This is the very highest rating in the GAP system! Our birds are harvested in our own USDA-inspected processing facility, where we have always possessed incredible respect for our animals. Please feel free to give us a call at the ranch if you have any further questions: 209.532.4950.

**Are the animals humanely raised & harvested?**

Yes! Our animals are raised with room to roam , whether indoors or outdoors. They're fed an all-vegetarian diet and are given the time to develop naturally. The animals are never given hormones, antibiotics or growth stimulants. Our priority is to ensure the animals are raised humanely and with compassion during every aspect of their life. Ultimately, our animals are happier and healthier which result in more flavorful and better quality products. Learn more about our animal welfare standards and if you would like talk with someone about our commitment to animal welfare feel free to give us a call here at the ranch (209) 532-4950.

65.     Defendant, through its other marketing materials, represents that its various Turkey Products are "GAP-Rated Step 3" and/or come from turkeys raised in compliance with GAP "Animal Welfare Rating 3 Enhanced Outdoor Access" or "Animal Welfare Rating 5+ Animal Centered" standards.

66.     Defendant's representations regarding animal welfare certification from GAP, reproduced below, contribute to the reasonable belief that all of its turkeys are "Thoughtfully

Raised."



67.     Defendant's marketing materials and labeling misrepresent that the turkeys are raised under the highest animal welfare standards at the Sonora Ranch, when in fact most of Diestel's turkeys are grown in Off-Site Facilities that no reasonable person would confuse for a ranch or facility in which turkeys are raised in ranch-like conditions, and are not located in Sonora, California.

68.     In reality, less than 1% of Diestel's birds match the GAP 5 marketing, from at

least 2012 to 2019. More than 99% of Diestel's birds are not GAP 5 rated and some are not GAP rated at all. Diestel purchases bird parts from contractors and does not require the contractors to be GAP rated. Even when Diestel does achieve a GAP rating for part of its operations, not all flocks at a particular facility have the GAP rating. Diestel's turkeys live approximately four months, but auditors visit facilities at 15 month-intervals, meaning that even flocks that are sold as GAP rated were never visited by a third-party auditor. Diestel's purported third party auditor, GAP, is not independent from the store, Whole Foods, that purchases and resells Diestel products as GAP rated. If Diestel fails to satisfy audit requirements, its nonconformances related to how it raises its birds can be cleared even when the birds are in cold storage. Diestel is also allowed to apply for deviations from a particular standard, and then still market its birds as having achieved that standard.

**D.     Diestel's Slow Grown and Proprietary Breeds Statements Are Likely to Deceive Reasonable Consumers Into Thinking That Diestel Birds Live Long Lives and That Diestel Does Not Use the Common Commercial Breed. In Reality, Diestel Birds Also Have Short Lives and Diestel Purchases a Common Commercial Breed.**

69.     The Diestel Difference page, 2015 website, states that at Diestel we "give our animals extra time to grow naturally" and "Diestel turkeys enjoy the freedom of being slow grown in the clean Sierra Nevada Foothills where they are raised almost twice as long and with four times as much space as conventional birds." The Family Secrets page says, "Don't rush things. We give our turkeys the time to develop flavor naturally."

70.     Diestel markets that its turkeys are raised two months longer and that it uses its own breeds. When presenting to grocery store chains, Diestel represents that it uses many different breeds to compare to the rest of the industry that uses only one standard breed. It also asserts that its birds "are raised almost twice as long and with nearly three times as much space as conventional birds."

71.     In reality, Defendant purchases the most common commercial turkey breed and slaughters the birds at approximately the same time as the rest of the commercial turkey industry.

**E.      Diestel's Small Family Farm Statements Are Likely to Deceive Reasonable Consumers Into Thinking That Diestel's Birds Are Cared For By the Family Members and That the Operation is No Bigger Than the Family. In Reality, Diestel Is a Multi-Site, Multi-State Operation.**

72.      On its 2015 website, Diestel published a family photo in front of outdoor turkeys and referred to its "truly family-owned and operated company." The website continues with a "Meet the Family" page and omits any clues to an operation larger than what five family members can manage. The 2015 website says, "We are one of the last small, family-owned turkey grower-processors in the United States." Diestel promotes the small family farm theme on Facebook with photos, and statements like "Diestel Turkey isn't just a brand…we are a FAMILY!" The post links to DiestelTurkey.com's "Meet the Family" page. In press releases, Diestel asserts that it is "one of the last small, family owned turkey grower-processors in the United States." In the Meet the Ranchers video, promoted on both its website and its Facebook page, Diestel emphasizes that it is a family run ranch by featuring mom, dad and siblings hand feeding and interacting with the birds and does not reveal the multi-site and multi-state operation that slaughters more than a million birds a year.

73.      In reality, Heidi Diestel cannot even estimate the number of birds that the Diestel operation grows. Even though she promoted herself in marketing materials as walking the flock, and put that video on the Diestel website that she managed, Heidi Diestel does not walk the flock on a daily or even weekly basis and has stated that it is not one of her responsibilities. Contrary to being a small family farm, Diestel employees 100-300 employees and only six of those are Diestel family members. Some of the sheds in which birds live their lives are as long as a football field and some facilities raise 400,000 birds each year.

**F.      Diestel's No Antibiotics Ever, No Chemicals Statements Are Likely to Deceive Reasonable Consumers Into Thinking That Diestel's Operations Are Free of Antibiotics and Chemicals. In Reality, Diestel Doses the Birds Thousands at A Time.**

74.      Diestel repeatedly promises consumers "no antibiotics," which is highly important to poultry purchasers. The 2015 website says, "our careful farming management and strict sanitation procedures eliminate the need for us to administer antibiotics." In the Meet the

Ranchers video, Jason Diestel says they "never" feed any antibiotics or chemicals to the turkeys. In press releases, Diestel asserts that "Diestel farmers walk the flock every day and pay close attention to their health, removing the need for antibiotics." When presenting information to grocery store chains, Diestel represents "No Antibiotics, Hormones or Growth Stimulants, Ever."

75.     In reality, Diestel's veterinarian has prescribed antibiotics, such as oxytetracycline and penicillin, for entire flocks of up to 10,000 birds at a time. Diestel's bird food has been screened for antibiotics and tested positive. Diestel also uses chemicals that address bird respiratory problems, E.coli and bacterial infections. Post-slaughter, Diestel uses ozone, chlorine and peracetic acid.

### G.     Diestel's Marketing Exploits Consumer Demand for Meat from Animals Not Raised on Large-Scale, Factory Farms.

76.     Consumers increasingly demand transparency about ingredients and sources that is largely driven by a desire to know how their food is made.[20] Studies have shown that modern consumers, define "healthy" food as food that is "locally sourced or sustainable."[21] The sourcing and growing of food, and how that effects its carbon footprint, matters to consumers.

77.     Many are willing to pay a premium for products that are believed to have come from animals that are not from industrial factory farms where they are treated "humanely or" "thoughtfully" as numerous consumer studies have documented.[22] For instance, a 2007 consumer survey found that 58% of consumers are willing to pay more for animal products labeled as "humanely raised."[23] Similarly, a 2010 survey found that 57% of consumers are willing to pay a premium for "food that promises to be produced according to higher ethical standards."[24]

---

[20] Cara Rosenbloom, WASHINGTON POST, *9 Ways Millenials are Changing the Way We Eat*, February 23, 2018, http://tinyurl.com/yxqv7gct (last visited September 2020).
[21] *Id.*
[22] Animal Welfare Institute, *Consumer Perceptions of Farm Animal Welfare*, https://awionline.org/sites/default/files/uploads/documents/fa-consumer_perceptionsoffarmwelfare_-112511.pdf (last visited July 10, 2019).
[23] *Id.* at 8.
[24] *Id.*

78.     A 2016 American Society for the Prevention of Cruelty to Animals ("ASPCA") survey found that two-thirds of consumers would be willing to pay more for animal products that are "welfare-certified."[25]

79.     A Consumer Reports 2015 survey also found that it is important to consumers that food not be produced using standard factory farm methods. For example, 84% of consumers said it was "important" or "very important" to improve living conditions for animals.[26]

80.     Defendant labels and advertises the Turkey Products as from the Sonora Ranch to appeal to consumers who are willing to pay a premium for products that they believe to be from turkeys raised on the idyllic Sonora Ranch. Defendant bolsters this idea by including animal-raising claims such as "Thoughtfully Raised on sustainable family farm with fresh air and plenty of room to roam" to target those consumers willing to buy and pay more for an animal product subject to higher welfare standards.

81.     An independent nonprofit organization concluded in 2019 that "thoughtfully raised" and similar terms should not be used on food labels because it leads to consumer deception.[27]

82.     Due to its misrepresentations, Defendant is able to charge a significant premium for Turkey Products, some of which are sold for as much as $8.99[28] or $9.99 per pound. By way of example, and for purposes of comparison, turkey products without animal raising claims from other typical agro-industrial facilities sell for as little as $0.59 per pound.[29]

---

[25] Animal Welfare Institute, *supra* n.2, at 7.

[26] Consumer Reports National Research Center, *Natural Food Labels Survey* (2015), at 3, *available at* http://www.consumerreports.org/content/dam/cro/magazine-articles/2016/March/Consumer_Reports_Natural_Food_Labels_Survey_2015.pdf.

[27] Animal Welfare Institute, *Label Confusion 2.0: How the USDA Allows Producers to Use "Humane" and "Sustainable" Claims on Meat Packages and Deceive Consumers*, published in September 2019, available                                                                                              at https://awionline.org/sites/default/files/publication/digital_download/19%20Label%20Confusion%20Report%20FINAL%20WEB%20II.pdf (last visited July 2020).

[28] *See* Eat Like No One, Whole Foods Market Turkey Prices 2015, http://www.eatlikenoone.com/whole-foods-market-turkey-prices-2015.htm.

[29] *See* Supermarkets with Thanksgiving Turkeys for Under $1 a Pound – or Free!, http://money.com/money/5023620/thanksgiving-turkey-free-sales-deals-cheap/, last visited July 10, 2019. Under federal poultry labeling regulations, a poultry product is "misbranded" where its labeling is false or misleading in any particular. 9 CFR § 381.1.

83.     Plaintiff and other consumers like him pay more for Defendant's Turkey Products based on their animal-raising claims that their turkeys are treated better than those on industrial farms.

84.     A nonprofit organization commissioned a consumer survey specific to Diestel's advertising. Survey respondents were exposed to Diestel's website and video advertising and then asked questions about their understanding. The findings include:

a) 91% of respondents thought that Diestel raises it turkeys at "the Diestel family ranch in Sonora, California." In reality, less than 1% of Diestel's birds are raised at Sonora Ranch.

b) 85% of respondents thought that the turkeys live outside. In reality, the turkeys live inside crowded sheds.

c) 54% thought that Diestel followed the GAP 5 or 5+ standards. In reality, less than 1% of Diestel's birds enjoy GAP Step 5/5+ conditions.

d) 92% thought that Diestel was a small operation where a family member is regularly personally involved for activities like walking the flock. In reality, Diestel employs more than a hundred people, contracts with other entities out of state, and operates across numerous states with facilities that have up to 15 flocks at a time and up to 20,000 birds in a flock.

## FEDERAL REGULATOR'S ROLE IN POULTRY LABELING

85.     The Poultry Products Inspection Act ("PPIA"), administered by USDA's Food Safety and Inspection Service, provides the baseline for poultry processing law and regulations.

86.     Under federal poultry labeling regulations, a poultry product is "misbranded" where its labeling is false or misleading in any particular. 9 CFR § 381.1.  Poultry labeling is false or misleading where any "statement, word, picture, design, or device which is false or misleading in any particular or conveys any false impression or gives any false indication of origin, identity, or quality." 9 CFR § 381.129(b). Federal law also prohibits trade names on labels that are false or misleading, 9 CFR § 381.129(a).

87.     Representing that a Turkey Product originates from the Sonora Ranch – *i.e.* not a

factory farm – is a statement of fact, as one example of Diestel's deception. The words and design on Diestel's labels that give rise to this representation are subject to the misbranding provisions embodied in the PPIA.

88.     The USDA-Food Safety and Inspection Service Compliance Guideline that addresses labels explains that animal raising terms such as "Humanely Raised" are a special statement or claim that must be approved by the Label Program Delivery Staff before entering commerce, per 9 C.F.R. § 412.1.

89.     However, the USDA-Food Safety and Inspection Service ("FSIS") ***does not independently verify through on-site inspections*** whether Defendant's animal-raising claims are true.

90.     Instead, the FSIS Labeling Guideline on "Documentation Needed to Substantiate Animal Raising Claims for Label Submissions" only requires that Defendant define its animal-raising claims, such as "Thoughtfully Raised," with explanatory statements like "fresh air" and "room to roam." FSIS also requires submission of evidence of self-serving statements from Defendant about its facilities and practices to substantiate its special animal-raising claims before placing the label on the Turkey Products that enter commerce.[30]

91.     For example, the FSIS guidance on "Free Range" or "Free Roaming" states in pertinent part:

> In order to use these terms on a label, poultry producers must provide a brief description of the bird's housing conditions with the label when it is submitted for approval. The written description of the housing conditions is evaluated to ensure the birds have continuous, free access to the out-of-doors for over 51% of their lives, *i.e.*, through their normal growing cycle. During the winter months in a northern climate, birds are not "free range," if they stay in coops all winter. Producer testimonials that support the use of the claim must state how the birds are raised in a northern climate in winter in order to conform to the meaning of "free

---

[30] Available at https://www.fsis.usda.gov/wps/wcm/connect/6fe3cd56-6809-4239-b7a2-bccb82a30588/RaisingClaims.pdf?MOD=AJPERES (last visited July 10, 2019).

range" during the winter months.[31]

92.     Because of the lack of independent oversight by the USDA-FSIS to review whether producers' animal-raising claims are correct, these labels are often used without verification as to their content.

93.     The USDA Office of Inspector General issued an audit report titled "Controls over Meat, Poultry, and Egg Product Labels," in June 2020. The executive summary concluded:

As a result, meat, poultry, and egg product labels may reflect inaccurate statements and claims made by establishments. Additionally, there is reduced assurance that establishments' generic labels meet requirements. Based on our sample results, we estimated that approximately 2,038 (15.00 percent) of the approved required labels and 161 (18.34 percent) of the approved generic labels may have one or more exceptions.

94.     Diestel has been cited for its failure to follow the Code of Federal Regulations related to poultry labeling. It made a special labeling claim of "Humanely Raised on Sustainable Family Farms" on its turkey products. The USDA slaughterhouse inspector discovered this and issued a "noncompliance" notice to Diestel for its unapproved use of that claim.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff Wetzel brings this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purposes of asserting the claims alleged in this Complaint on a common basis. Plaintiff brings this action on behalf of herself and all members of the following classes:

**New Mexico Class:** All persons in New Mexico who purchased one or more of Diestel's Turkey Products on or after November 19, 2016.

96.     Excluded from the Class are any of Defendant's officers, directors, or employees; officers, directors, or employees of any entity in which Defendant currently has or has had a controlling interest; and Defendant's legal representatives, heirs, successors, and

---

[31] FSIS website, "Turkey Raised by the Rules," https://www.fsis.usda.gov/wps/portal/fsis/topics/food-safety-education/get-answers/food-safety-fact-sheets/poultry-preparation/turkey-raised-by-the-rules/ct_index, (last visited July 10, 2019).

assigns. Plaintiff reserves the right to modify, change, or expand the Class definition, including proposing additional subclasses, based upon discovery and further investigation.

97.     Upon information and belief, the scope of this Class definition, including its temporal scope, may be further refined after discovery of Defendant's and/or third-party records.

98.     **Numerosity.** Class members are so numerous that joinder is impracticable. Thousands of individuals were deceived by Defendant's advertising.

99.     **Typicality.** Plaintiff Wetzel's claims are typical of the claims of the Class. Plaintiff Wetzel is a member of a well-defined Class of similarly situated persons, and the members of the Class were similarly affected by Defendant's conduct and are owed the same relief, as alleged in this Complaint. Members of the Class are ascertainable from Plaintiff Wetzel's description of the Class and/or Defendant's records and/or records of third parties accessible through discovery.

100.     **Adequacy.** The representative Plaintiff will fairly and adequately represent the members of the Class and has no interests that are antagonistic to the claims of the Class. Plaintiff Wetzel's interests in this action are antagonistic to the interests of Defendant, and Plaintiff Wetzel will vigorously pursue the claims of the Class.

101.     **Commonality and Predominance.** The representation that the Turkey Products originate from a family "Turkey Ranch" in "Sonora, California" that does not treat its turkeys like a traditional factory farm is uniformly communicated to Plaintiff and every other person, who purchase any of the Turkey Products during the Class Period. Common questions of law and fact affect the rights of each member of the Class, and a common remedy is sought for the Class. There are substantial questions of law and fact common to all members of the Class that will predominate over any individual issues. These common questions of law and fact include, without limitation:

　　　　a)     whether Defendant advertised its Turkey Products with the intent to not sell them as advertised in violation of New Mexico Stat. Ann. § 57-12-2(D)(7);

b)   whether Defendant represented in advertising for the Turkey Products that the Products had characteristics, ingredients, uses, or benefits that they do not have, in violation of New Mexico Stat. Ann. § 57-12-2(D)(5);

c)   whether Defendants' labeling, marketing, and sale of the Turkey Products constituted unfair, deception, fraudulent, or unlawful conduct;

d)   Whether Defendant materially mispresented, either through express or implied representations, that the Turkey Products had characteristics, ingredients, uses or benefits that they do not have;

e)   Whether Defendant procured and retained ill-gotten gains from Plaintiff and members of the Class;

f)   Whether Defendant's conduct injured consumers and, if so, the extent of the injury;

g)   whether Plaintiff and Class members are entitled to damages, and if so, in what amount; and

h)   whether Plaintiff and Class members are entitled to equitable relief, including restitution or injunctive relief.

102.   A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of Plaintiff Wetzel and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

103.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. Trial of Plaintiff Wetzel's and the Class members' claims is manageable.

104.   Plaintiff Wetzel has retained counsel who are competent and experienced in consumer protection litigation, including class actions relating to false advertising and who

have successfully represented plaintiffs in complex class actions. Plaintiff Wetzel's counsel currently represents other plaintiffs in several similar complex class actions involving false advertising.

105.     Plaintiff Wetzel knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance of a class action.

## NOTICE OF CLAIMS

106.     Diestel has been on notice of the claims asserted in this action for years. First, Diestel was sued by a nonprofit organization, Direct Action Everywhere SF Bay Area, in January 2017 for false advertising and unfair competition. Second, a Complaint alleging substantially similar claims for a California class was filed against Defendant in the Northern District of California in October 2020.

## CAUSES OF ACTION

### COUNT I
### Violations of the New Mexico Unfair Practices Act, § 57-12-1 et seq.
### on Behalf of Plaintiff Wetzel and the Class

107.     Plaintiff realleges and incorporates by reference each preceding paragraph as if fully set forth herein.

108.     Plaintiff is a person as defined in § 57-12-2(A).

109.     Diestel knowingly made false and misleading oral or written statements (or in the exercise of reasonable diligence should have been aware of the false and misleading statement), visual descriptions, or other representations in connection with the sale of goods in the regular course of Diestel's trade, and those statements and representations may tend to or deceive or mislead any person (§ 57-12-2(D)), specifically these unfair or deceptive trade practices:

a)     Diestel caused confusion or misunderstanding as to the source, sponsorship, approval or certification of goods;

b)     Diestel caused confusion or misunderstanding as to affiliation, connection or association with or certification by another;

c)      Diestel used deceptive representations or designations of geographic origin in connection with goods;

d)      Diestel represented that its goods have sponsorship, approval, characteristics, and benefits that they do not have;

e)      Diestel represented that goods are of a particular standard, quality or grade or that the goods are of a particular style or model when they are of another;

f)      Diestel used exaggeration, innuendo or ambiguity as to a material fact or failed to state a material fact when doing so deceives or tends to deceive;

g)      Diestel failed to deliver the quality of goods contracted for;

110.    Diestel engaged in unconscionable trade practices in connection with the sale of goods by

a)      taking advantage of the lack of knowledge, ability, experience or capacity of Plaintiff and consumers to a grossly unfair degree, or

b)      resulting in a gross disparity between the value received by Plaintiff and consumers and the price paid.

111.    Diestel willingly engaged in these practices.

112.    Diestel intentionally and knowingly misrepresented its Turkey Products and knew or should have known that its conduct violated the N.M. Unfair Practices Act.

113.    Diestel owed Plaintiff and similarly-situated consumers a duty to disclose all material facts concerning the Turkey Products because it had exclusive knowledge about the raising, treatment and marketing of the turkeys.

114.    Diestel's misrepresentations and omissions caused damages to Plaintiff and similarly-situated consumers in an amount to be determined at trial.

115.    Plaintiff has suffered lost money and property as a result of Diestel's unlawful practices.

116.    Plaintiff and similarly-situated consumers also seek treble damages, injunctive relief, costs and attorneys' fees and any other proper relief under the N.M. Unfair Practices Act.

## COUNT II
### Violation of New Mexico's False Advertising Law, § 57-15-1 et seq., on Behalf of Plaintiff Wetzel and the Class

117.     Plaintiff realleges and incorporates by reference each preceding paragraph as if fully set forth herein.

118.     Plaintiff is a private citizen and initiates this action on her behalf and all others similarly situated.

119.     Defendant has violated N.M. Stat. Ann. §§ 57-15-1 *et seq.* by falsely advertising the Turkey Products in the conduct of a business, trade, or commerce within the state of New Mexico.

120.     The advertising, including labeling, of the Turkey Products was and is misleading in material respects.

121.     The advertising of the Turkey Products, including labeling, failed to reveal facts material in the light of such representations with respect to the commodity to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

122.     Diestel willfully engaged in this false advertising.

123.     This is an exceptional case in which the Defendant has willfully engaged in false advertising, thus making an award of costs or attorneys' fees an appropriate remedy. N.M. Stat. Ann. § 57-15-5.


## COUNT III
### Common Law Unjust Enrichment Under New Mexico Law on Behalf of Plaintiff Wetzel and the Class

124.     Plaintiff realleges and incorporates by reference each preceding paragraph as if fully set forth herein.

125.     Plaintiff and her fellow consumers enriched Diestel by buying the Turkey Products. The benefit was not conferred gratuitously nor did Plaintiff or her fellow consumers interfere in Diestel's business.

126.     Diestel accepted and retained the benefit conferred by the purchases of Plaintiff

and her fellow consumers.

127.     It would be unjust for Diestel to retain these benefits because Diestel obtained these benefits by misleading and deceiving Plaintiff and her fellow consumers by representing that the Turkey Products are from Sonora Ranch, "Thoughtfully Raised," third-party certified, slow grown, from a small family farm, raised without chemicals, and produced in an environmentally friendly way when they are not.

128.     As a result of this unjust enrichment, Diestel should disgorge its benefits in an amount to be determined at trial.

## DAMAGES

129.     As a result of Defendant's negligent misrepresentations, including violations of New Mexico statute, Plaintiff was damaged in the amount of the purchase price, or in the alternative, in the amount of the purchase price tied to the false and misleading representations, in amounts to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant, as follows:

A.     An order certifying the proposed Class; appointing Plaintiff Wetzel as representative of the Class; and appointing Plaintiff Wetzel's undersigned counsel as class counsel for the Class;

B.     A declaration that Defendant is financially responsible for notifying Class members of the pendency of this suit;

C.     An order enjoining Defendant's unlawful and deceptive acts and practices that includes, but is not limited to, requiring Defendant to cease the acts of unfair competition alleged here and to correct its advertising, promotion, and marketing campaigns by, without limitation, removing and/or refraining from making representations in the Turkey Products' marketing materials that the Products come from turkeys raised on the Sonora Ranch, are "Thoughtfully Raised," are third party certified at the highest animal welfare standard, are slow grown and proprietary breeds, come from a small family farm, are raised antibiotic and

chemical free, and produced in an environmentally friendly way;

D.      Actual damages or $100 per purchase, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann § 57-12-10;

E.      Restitution for members of the Class to recover Defendant's ill-gotten benefits;

F.      Monetary damages, statutory damages and injunctive relief for members of the Class in the maximum amount provided by law;

G.      Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

H.      An order finding in favor of Plaintiff Wetzel and the Class on all counts asserted herein;

I.      An order requiring Defendant to pay attorneys' fees and litigation costs to Plaintiff;

J.      Ordering Defendant to pay both pre- and post-judgment interest at the highest rate allowable by law on any amounts awarded; and

K.      Any further relief that the Court may deem appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: November 19, 2020                    Respectfully submitted,

**ELSNER LAW & POLICY, LLC**          **THE POTTS LAW FIRM, LLP**


By: _Gretchen Elsner_                       By: /s/ *Timothy L. Sifers*
Gretchen Elsner                             Timothy L. Sifers
Gretchen@ElsnerLaw.org                      Nathaniel K. Scearcy
314 South Guadalupe Street                  *To be Admitted Pro Hac Vice*
Santa Fe, New Mexico 87501                  1901 W. 47th Place, Suite 210
Telephone: (505) 303-0980                   Westwood, KS 66205
                                            Telephone: (816) 931-2230
                                            Facsimile: (816) 931-7030
                                            Email: tsifers@potts-law.com
                                            nscearcy@potts-law.com

*Counsel for Plaintiff & the Proposed Class*