Court of Appeal, First Appellate District
Charles D. Johnson, Clerk/Executive Officer
Electronically RECEIVED on 5/20/2022 at 12:46:17 PM

Court of Appeal, First Appellate District
Charles D. Johnson, Clerk/Executive Officer
Electronically FILED on 5/20/2022 by S. Wheeler, Deputy Clerk

Case No. A162017

IN THE COURT OF APPEAL, STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION TWO

_____

**DIRECT ACTION EVERYWHERE SF BAY AREA,**
an unincorporated association,
*Plaintiff-Appellant*,

v.

**DIESTEL TURKEY RANCH,**
a California corporation, exempt private foundation,
*Defendant-Respondent.*

On Appeal from the Superior Court of Alameda County
The Hon. Julia Spain
Superior Court Case No. RG17847475

_____

**APPELLANT'S APPENDIX
IN LIEU OF A CLERK'S TRANSCRIPT**
(Cal. Rules of Court 8.124)

**Volume 4 of 11, Pages 857 to 1142**

_____

| | |
|---|---|
| Gretchen Elsner | James A. Frieden |
| ELSNER LAW & POLICY, LLC | LAW OFFICE OF JAMES A. FRIEDEN |
| Gretchen@ElsnerLaw.org | jfriedenatty@gmail.com |
| 314 S. Guadalupe Street, Ste 123 | 862 Fiske Street |
| Santa Fe, NM 87501 | Pacific Palisades, CA 90272 |
| Telephone: (505) 303-0980 | Telephone: (310) 917-1940 |

*Attorneys for Plaintiff-Appellant*

AA 0857

**ELSNER LAW & POLICY, LLC**
Gretchen Elsner (Pro Hac Vice)
Gretchen@ElsnerLaw.org
314 South Guadalupe Street
Santa Fe, NM 87501
Telephone: (505) 303-0980

**SIEGEL, YEE, BRUNNER & MEHTA**
Dan Siegel, SBN 56400
Sonya Z. Mehta, SBN 294411
sonyamehta@siegelyee.com
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| DIRECT ACTION EVERYWHERE SF BAY AREA, an unincorporated association, on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>DIESTEL TURKEY RANCH, a California corporation, exempt private foundation,<br><br>Defendant. | CASE NO. RG17847475<br><br>**PLAINTIFF'S COUNSEL'S DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**<br><br>Judge: Hon. Julia Spain<br>Dept.: 520<br><br>Case filed: January 30, 2017<br>Judgment Date: November 23, 2020<br>Hearing Date: February 17, 2020<br>Reservation Number: R-2229540<br>Hearing Time: 2 p.m. |

i

I, Gretchen Elsner, declare under penalty of perjury:

1. From 2016 to the present, I have represented Plaintiff Direct Action Everywhere SF Bay Area in pre-suit settlement negotiations and litigation, including serving as lead trial counsel. I have personal knowledge of the facts stated in this declaration, and if called upon to do so, could and would testify to these facts.

2. I have practiced law continuously for more than 16 years in the State of New Mexico and was admitted to *pro hac vice* in this case. At all times I have been a member in good standing.

**Qualifications of Counsel**

3. I graduated from NYU Law School in 2004, clerked for The Honorable James A. Parker of United States District Court for the District of New Mexico in 2004-05, clerked for The Honorable Justice Patricio M. Serna of the New Mexico Supreme Court in 2005-06, and clerked for The Honorable Robert H. Scott of United States District Court for the District of New Mexico in 2011-2014. I have served as an Administrative Law Judge for the State of New Mexico, worked at a multi-state law firm representing various large entities in litigation, and was a staff attorney at a regional nonprofit advocacy organization where I drafted legislation, served as an expert witness in the Legislature for the legislation, and assisted in getting a bill passed the first year it was introduced. During my career, I have been invited to provide legal education to law schools, law clerks, and lawyers, through teaching CLEs or guest lecturing in academic settings. Topics range from tax-exempt organizations to employment to elections to litigation strategy.

4. In 2014, I formed Elsner Law & Policy, LLC and I have operated my own firm continuously since then. A significant amount of my firm's time is devoted to representing plaintiffs in litigation against large industrial agricultural operations, commonly known as factory farms, sometimes referred to as CAFOs (concentrated animal feeding operations). Over the last 4-5 years, I have developed specialized expertise in this area and collaborate with nonprofit advocacy organizations and public interest attorneys across the country, whether it be investigating legal violations, or enforcing the law through negotiation or litigation. I also work with private firms in multiple jurisdictions on factory farm fraud.

AA 1036

5. Attorney Helga Schimkat assisted me in this case from November 2018-June 2019 and worked 32.5 hours and her rate is $914 an hour. She worked entirely on contingency. Ms. Schimkat graduated from Yale University in 1986, Columbia Law School in 1990 and was admitted to Connecticut bar in 1990. She also earned admission in New York in 1991 and New Mexico in 1994. Ms. Schimkat founded the Animal Law Section of the New Mexico State Bar in 2011 and the New Mexico Humane Conference named her Animal Advocate of the Year in 2011. She has conducted studies on animal welfare and spoken and published on animal law topics. In addition to years of law firm employment, Ms. Schimkat has been employed by nonprofit organizations relevant to the litigation at hand, such as Animal Protection of New Mexico and consulted with same. She also served as Chief of Staff to the House Majority Leader for the New Mexico Legislature and Lead Analyst for the House Judiciary Committee. Ms. Schimkat assisted with early analysis of consumer perception, reviewed Diestel's animal raising representations and organized evidence proving that Diestel's animal representations were false. When Diestel provided an initial privilege log with 1,273 entries, many of which were deficient, as well as an updated privilege log that continued to contain deficiencies, Ms. Schimkat combed through the original and updated logs and found entries for which attorney-client privilege were claimed when no attorney was party to those particular entries or no author, recipient or person copied was named; entries for which that included insufficient identification of individuals as well as insufficient description of their capacity with respect to Diestel; entries that disappeared from the initial log by the time of the update without the referenced document having been produced; and entries for which a privilege was claimed for "Trade Secret/Third Party Privacy Rights" without explanation and without complying with the Amended Protective Order that the parties signed on May 14, 2019. Other deficiencies that Ms. Schimkat flagged were insufficient descriptions of the privilege claimed; vague subjects; and buried entries in updated log due combining entries without reference to which from the original were contained in the new entry. Addressing Diestel's insufficient and flawed privilege logs created additional, unnecessary fees in order to obtain discovery.

6. Stefanie Wilson assisted me in this case from January – March 2019 and worked 24.5 hours and her rate is $465 an hour. She worked at an extremely low bono rate for the nonprofit client.

Ms. Wilson graduated from Harvard University in 2008, earned a master's degree in Animals and Public Policy from Tufts Cummings School of Veterinary Medicine in 2011, and graduated summa cum laude from University of California, Irvine School of Law in 2014. After law school, Ms. Wilson clerked for The Honorable Harry T. Edwards of the U.S. Court of Appeals for the District of Columbia. Her teaching experience includes animal law and litigation classes at two California law schools and her scholarship on the poultry industry harm to humans, birds and the environment has been published in in the Animal Law Review. She has worked at the Animal Legal Defense Fund as Litigation Fellow and Mercy for Animals as the Legal Advocacy Manager. Ms. Wilson has specialized experience in government regulation of animals raised for food that was relevant to this case. Due to Diestel marking much of its production as attorneys' eyes only, counsel was not able to use the Plaintiff's volunteers to review a substantial number of documents. Counsel hired Ms. Wilson, at an out-of-pocket expense that could have been avoided if the documents were not so overly designated, in order to review documents that the client was not allowed to see.

   7. Cecile Topet was employed by me to work on this case from June – December 2018 and worked 321.5 hours and her rate is $378 an hour. Ms. Topet earned a bachelor of law degree from Universite de Namur in Belgium in 2014, a master of law degree from Universite de Strasbourg in France in 2016, and an LLM from New York University School of Law in 2018. At NYU Law, she conducted extensive legal research on environmental and animal law in the international context. Ms. Topet, as a first-year attorney working full time for me, worked on all aspects of the case that was in the midst of highly contested discovery. Ms. Topet assisted in drafting discovery requests, reviewing discovery responses, researching case law, drafting meet and confer letters, drafting subpoenas to third parties, drafting motions, drafting questions for depositions based on reviewing discovery, assembling notebooks for the court before hearings, and drafting settlement offers. Much of this work was tedious and repetitive (because meet and confers were not producing any movement) and was therefore assigned to an attorney with a lower billable rate.

   8. Linda Drysdale assisted me from September 2018 to present and logged 52 hours and her rate is $206 an hour. Ms. Drysdale began her career in the legal field in 1987 and in 1998 transitioned into litigation support with a focus on the role of technology expectations and processes

related to electronic discovery and trial. Ms. Drysdale provided paralegal support with an emphasis on electronic discovery and document review and also assisted with the technical aspects of pleading and motion preparation and filings. Ms. Drysdale worked on call remotely for assistance during the trial days in October – December 2019. However, Ms. Drysdale does not claim any time for her remote trial assistance work.

9. Mikalah Singer was employed by me as a summer associate in 2019 and worked at least 24.5 hours. Her rate is $206 an hour. Ms. Singer earned a bachelor's degree from Case Western Reserve University in 2017 and a law degree from Lewis & Clark Law School in 2019. Ms. Singer conducted legal research on the FAL and UCL that was intended for a summary judgment motion and then eventually used in the pre- and post-trial briefs. She also assisted in preparing for depositions.

10. Christal Weatherly assisted me from September 2017 to June 2018 and worked 57.4 hours. Her rate is $206 an hour. Ms. Weatherly worked for me while she was attending the University of New Mexico School of Law.

11. I directly supervised each of the above individuals and every individual under my supervision maintained contemporaneous billing records for the time claimed, which are attached here. I used paralegal support, law clerk and junior attorney support, whenever I thought I could more efficiently or cheaply produce the work product necessary. This case was appropriately and efficiently staffed, where each individual did work appropriate for his or her level of expertise.

12. Richman Law Group also worked on this case from inception and until shortly after Diestel filed cross-claims against Plaintiff. Attorney Kim Richman logged 245.8 hours and his Laffey Matrix rate $759. Attorney Jaimie Mak claims 182 hours and her Laffey Matrix rate is $759. Attorney Renee Wicklund logged 61.25 hours and her Laffey Matrix rate is $759. Attorney Adam Lynn recorded 72.5 hours and his Laffey Matrix is rate $465. Attorney Clark Binkley recorded 115.6 hours and his Laffey Matrix rate is $378. Attorney Jay Shooster recorded 314.5 hours and his Laffey Matrix rate is $378. Julia Haramis worked 70 hours and her rate is $206. Clerk Paolo Musto worked 18.5 hours and his rate is $206. The Richman Law Group's lodestar is $569,923, timesheets are attached.

*Plaintiff's Suit Catalyzed Diestel's Changes – Litigation Objective Achieved*

13. Plaintiff's primary litigation objective was to cause Diestel to change its false advertising, as evidenced by Third Amended Complaint, Prayer for Relief, item A.

> An order enjoining Defendant's unlawful and deceptive acts and practices, pursuant to California Business and Professions Code §§ 17203 and 17535, that includes, but is not limited to, requiring **Defendant to cease the acts of unfair competition alleged here and to correct its advertising, promotion, and marketing campaigns by, without limitation, removing and/or refraining from making representations in the Turkey Products' marketing materials that the Products are "Thoughtfully Raised," "Humanely Raised on Sustainable Family Farms," "Range Grown," "Slow Grown," and/or "Thoughtfully Raised on Sustainable Family Farms"**

Plaintiff readily achieved that goal throughout the litigation, culminating in the public announcement during trial that Diestel abandoned all animal raising claims in its advertising campaign.

14. In January 2017, Plaintiff filed this lawsuit based on Diestel's representations about its turkey raising practices. After the lawsuit, Diestel started to tweak its statements.

15. During trial, Diestel compared its old website (Ex. 2151, website from 2015-2018, Heidi Tr. 1040:9-20, for which it curiously did not have an exact date) to Diestel's statements after it was exposed and sued (Ex. 2145, Facebook Oct. 2016; Ex. 2146, Facebook Nov. 2017; Ex. 2147, Facebook Nov. 2017; Ex. 2193, 2016 website, Blackman, Hukku Tr. 660:16-22; Ex. 2194, June 2017 website, Blackman, Hukku Tr. 665:9-19; Ex. 2152, current website produced on the day the trial exhibit list was due). The comparison shows that Diestel progressively became more truthful on the topics that were raised by Plaintiff. As an example of then and now advertising, the consumer survey emphasized what was available to consumers leading up to filing the lawsuit in January 2017 and materials that continued the misleading themes even after the lawsuit was filed and until trial. The Meet the Ranchers video (Tr. Ex. 62) used in the survey was on Diestel's website (Tr. Ex. 4) for years, including when Plaintiff sent Diestel pre-suit demand letters. After Plaintiff filed suit, Diestel made a newer video (Tr. Ex. 65) and published it on its website around May 2017 (Heidi Tr. 275:2-15). While Diestel contends (brief at 13:22) that the May 2017 video not available to consumers when the lawsuit commenced relieves it of liability, it is also evidence of how filing the lawsuit changed Diestel's advertising to the public. While Diestel claims that the consumer survey used "outdated" marketing

materials, Def's post-trial brief at 10:3, the "outdated" materials reflect what Diestel was promoting to the public at the time that Plaintiff filed suit. The reason that those materials are "outdated" is because Diestel changed its advertising in response to Plaintiff's Complaint.

16. Diestel points to representations in exhibits dated after the lawsuit was filed and claims that those are "clarifying disclosures." Diestel's post-trial brief at 4:5-6. They are actually evidence of Plaintiff's lawsuit being the catalyst for Diestel's change. The updated or disclosure materials that Diestel presented at trial did not exist at the time that Diestel got caught. These changes are not disclosures or disclaimers for previously published false and misleading statements, but are instead evidence that Plaintiff's advocacy was the catalyst for Diestel's change.

17. Throughout the years of litigation, Plaintiff also witnessed Diestel responding to Plaintiff's allegations in sometimes humorous ways. For example, Diestel's neighbor, Mr. Kent Larson, was deposed in this matter and testified that Diestel's turkeys were never outside. Mr. Jason Diestel attended that deposition. The morning after Mr. Larson's deposition, he reported that the turkeys were outside at 6:15 a.m. Larson Tr. 347:1-18.

***Pre-Litigation***, October 2016 – January 2017.

18. Plaintiff made pre-suit attempts to settle. Before filing any lawsuit, Plaintiff wrote to Defendant on October 17, 2016 and asked for Diestel to cease the false advertising either by aligning its practices with its advertising or changing the advertising. Diestel did not respond. Plaintiff wrote again on November 11, 2016 and again offered an opportunity to discuss corrective action. On December 1, 2016, counsel met and conferred and on December 6, 2016, Plaintiff's counsel offered the name of a mediator. On December 12, 2016, the parties met and conferred and on December 15, Plaintiff wrote, "We are amenable to hearing your ideas to make Diestel Turkey Ranch's marketing materials consistent with its turkey raising and slaughtering practices." Plaintiff offered to draft a settlement proposal. Diestel did not respond. On January 9, 2017, Plaintiff provided a draft complaint and notice that Plaintiff intended to file it.

***Litigation Leading Up To Trial***, January 2017 – September 2019.

***Settlement Attempts***

19. After filing suit in January 2017, Plaintiff continued to engage in good faith settlement discussions. On November 6, 2017, Plaintiff attended mediation with U.S. Magistrate Judge Margaret Nagle, retired, through JAMS, which concluded shortly after Judge Nagle informed Plaintiff's counsel that Diestel left a few hours into the mediation day. On November 16, 2018, Plaintiff offered to settle the false advertising case and emphasized aligning practices and advertising. Diestel did not respond. On September 20, 2019, Plaintiff attended a settlement conference with Dept. 303. During this time, Plaintiff's counsel continued contact with Judge Nagle regarding her attempts to settle the case.

20. Plaintiff also made CCP 998 offers on Defendant's cross-claims on September 18, 2018 and November 16, 2018, which Diestel ignored.

21. Plaintiff also expended considerable out-of-pocket expense and attorney hours to attempt to obtain the relief via settlement instead of ongoing litigation.

22. From working on this matter from 2016 to the present, I can whole heartedly attest that Diestel's litigation tactics made this case significantly more expensive than need be. Open animus toward the animal rights activists appeared to be a motivating factor to never settle with Plaintiff, even though Plaintiff's litigation objective was modest, reasonable, in the public interest, and ultimately accomplished by Diestel ceasing its false advertising campaign.

*Judicial Reassignments*

23. The case was reassigned numerous times and the parties appeared before Judge Herbert (then reassigned to complex), Judge Hernandez (reassigned when he retired), Judge Petrou (reassigned when she moved to appellate court), Judge Markman (reassigned when he went on medical leave), and Judge Spain (papers only, no hearings). The reassignments necessitated more attorney hours.

*Motion Practice*

24. Plaintiff defended and survived demurrers (April 2017, December 2017), engaged in numerous case management conferences over several years, briefed motions to strike, briefed motions for reconsideration, and briefed motions to compel, including addressing novel and complex issues for the judiciary regarding animal rights activism.

***Discovery***

25. Plaintiff expended a significant amount of time extracting honest discovery responses when Diestel provided evasive responses and marked its responses confidential and attorneys' eyes only. For example, the month before trial, Diestel supplemented its interrogatory response to admit that it operated eight other farms in California besides Sonora Ranch. Tr. Ex. 22-7, Sept. 2019. That was a key fact demonstrating the falsity of the advertising by promoting only the show ranch. Diestel would not have finally corrected its false interrogatory response if Plaintiff had not proceeded to trial. As another example, when directly asked to identify the antibiotics used on Diestel turkeys via an interrogatory, Diestel failed to respond candidly and continued to make statements that would mislead reasonable consumers about its operations such as, "Diestel does not use or introduce any antibiotics to the turkeys that it packages and sells for commercial purposes." Tr. Ex. 19-18, June 2017. Then Diestel responded to another interrogatory: "Diestel does not…administer antibiotics or other chemicals to turkeys used to supply raw materials for Diestel brand products. If turkeys are sick and require antibiotics, then the antibiotics must be prescribed by a veterinarian and the turkeys are not used in Diestel's products." Tr. Ex. 20-9, July 2018. At trial, Plaintiff introduced Diestel's own vet's records on administering antibiotics to thousands of Diestel birds at the time and cross-examined Diestel's turkey nutritionist on testing for antibiotics. Ongoing disputes over Diestel's evasive interrogatory responses and refusal to timely produce documents took considerable amount of time for Plaintiff's counsel to address.

26. Plaintiff was extremely lean in scheduling depositions and only deposed Diestel's three principles (Jason Diestel, Heidi Diestel Orrock, Jared Orrock) and Diestel's neighbor (Kent Larson) in order to prosecute the matter as efficiently as possible. By contrast, Diestel sought depositions of more than a dozen individuals and deposed Wayne Hsiung over the course of three days.

27. Plaintiff's counsel spent time addressing antics regarding deposition scheduling and timing. Diestel no-showed for the deposition of Dr. Sherstin Rosenberg (Plaintiff's vet expert), after the deponent had driven hours to appear and was ready to offer her testimony, again requiring more time by Plaintiff's counsel in rescheduling that deposition several times. On a second attempt, Diestel was not prepared to complete Dr. Rosenberg's depo in the time allotted and requested that she appear

a third time for Diestel to ask her more questions. For Dr. Sanjay Hukku's deposition (the consumer survey expert), defense counsel was not able to complete the deposition during normal busines hours and kept the deponent into the early evening in an attempt to keep asking questions as the expert was exhausted. When Plaintiff noticed depositions of the Diestels, and scheduled to fly to depose Diestel's witnesses, Diestel waited until the last minute to surprise counsel with an announcement of the entire family's unavailability for something that had been ostensibly planned prior to the depo notice being sent, requiring more time and effort to reschedule those depositions.

28. Defense counsel's conduct during discovery caused Plaintiff more time to prosecute the case than what should have been necessary to address the merits. For example, after defense counsel were so hostile and screaming during a meet and confer call that people down the hall in Plaintiff's counsel's office were concerned about what was transpiring over the phone, Plaintiff's counsel suggested that the parties themselves record the meet and confer calls in order to prevent future disputes, prevent defense counsel from documenting events that did not occur, and misunderstandings.

*Trial*, eight days across October 2019 – December 2019.

29. Plaintiff was forced to proceed to trial because Defendant had ignored or rejected all of Plaintiff's settlement offers and refused to make its principals available for depositions before the summary judgment motion deadline, leaving trial as the only option to resolve the case.

30. Plaintiff's counsel prepared eight of its own witnesses to testify (Diane Gandee Sorbi, Michael Goldberg, Jude Li, Kent Larson, Wayne Hsiung, Priya Sawhney), including the consumer expert (Dr. Sanjay Hukku) and veterinary expert (Dr. Sherstin Rosenberg) who the court deemed qualified to offer their opinions. Plaintiff's counsel prepared to cross-examine four witnesses who had previously been deposed (Heidi Diestel Orrock, Jason Diestel, Jared Orrock, Dr. Joy Mench) and cross-examined four witnesses who had never been deposed (Kelly Crymble, Dan Neuerberg, Dr. Rebecca Reed Arthurs, Dr. John Kuhl). Even without having deposed these individuals, Counsel's preparation and skill on their feet elicited crucial testimony from each of these witnesses. For example, Dr. Reed Arthurs, Diestel's expert hired to critique the consumer survey, readily admitted that she did not do her own survey and provided a long list of positive attributes for the only survey that was done.

*Litigation After Trial*

31. After 8 days of trial, Plaintiff's counsel summarized all of the testimony and exhibits into a 25-page post-trial brief and 10-page reply brief, largely with the help of Plaintiff's volunteers.

**Counsel's Hours Are Reasonable**

32. Given that Plaintiff's counsel worked on the case from 2016 to present, including a trial that is rare event in a false advertising case, counsel's hours are reasonable. Plaintiff's counsel did not bill for travel time over the course of several years even though each trip involved an hour's drive to the airport in New Mexico, plane travel, and BART in the Bay Area to attend hearings, depositions and tial.

33. Counsel's hours are also reasonable in light of the number of tactics that were employed to deter both Plaintiff and Counsel from continuing. As far back as 2017, Plaintiff's team had to petition the Court for a simple extension when communication broke down with defense counsel over professional courtesies. As another example in 2017-2018, Diestel informed Plaintiff that if Plaintiff did not drop its false advertising suit, it would file cross-claims against the entity and individuals. Plaintiff did not back down from pursuing its case and Diestel did file cross-claims. However, the factual bases for the cross-claims were apparently not researched and Diestel sued two journalists for trespass even though they had never been to Diestel's property and had only engaged in the First Amendment protected activity of working on the Deadly Feast report. Plaintiff's counsel invested time and energy in finding them their own counsel to defend against Diestel's wholly unsupported claims until Diestel finally dropped them. During discovery, Plaintiff issued a subpoena to one of defense counsel's clients. Defense counsel refused to accept service on behalf of the client, which caused considerable more time and energy in getting the subpoena served.

34. Counsel kept hours down by relying as much as possible on Plaintiff's volunteers. To the extent possible given the confidentiality designations, Counsel trained Plaintiff's volunteers to review discovery. Counsel also routinely relied on Plaintiff for local paralegal support, such as messengering documents to the courthouse.

35. Overall, Plaintiff's counsel has engaged in billing judgment before tasking a biller to an assignment, afterward by not recording and claiming all hours, and by deleting arguably compensable time.

**Counsel's Hourly Rate Is Reasonable**

36. My hourly rate is reasonable because it does not exceed the rates in the Laffey Matrix rates, which are regularly accepted by California state courts as reasonable fees. My rate is lower than attorneys in other consumer protection-factory farm fraud cases in the Bay Area. In another case I am litigating, counsel have represented to the court that their client pays $850 an hour for an associate and $1,210 for a partner with fewer years of experience than me. For the attorneys and law students I supervised during this litigation, the hourly rate sought is also within the Laffey Matrix guidelines and I have submitted only the hours that I think were reasonably necessary to prosecute the case. I voluntarily reduced their lodestar to address any time attributable to the learning curve or other inefficiencies.

**Additional Considerations**

37. My practice is nearly entirely public interest clients. Nonprofit clients routinely to ask me to take on their causes and cases even though they do not have funds for attorneys. I am able to do this work because of the potential for attorneys fees in cases in which I obtain the client's litigation objective and am entitled to fees.

38. This case presented novel and difficult issues because of the extensive research into business operations of a private company that was trying to hide key facts (such as the outsourcing of products bearing the company's name), the highly technical federal regulatory scheme Diestel raised in order to defend itself, third party certifications, the structure of the poultry business, and the veterinary science involved in raising the animals (breeds, diseases, debeaking, stocking density). Counsel had to become familiar with these areas in order to uncover the fraud, and because of the confidentiality designations, often had to do this without client assistance.

39. There was not any blueprint for litigating a case against a factory farm over how it raises its animals. Consumer litigation against agricultural producers for their animal raising claims is still relatively new, and when preparing for trial, Counsel could not find any attorneys who had

AA 1046

actually taken a false advertising case to trial since these types of cases usually settle. Furthermore, few attorneys are willing to take on cases that involve investing a considerable amount of time watching animal cruelty on video and even fewer attorneys are willing to represent a client who risks trespass charges for obtaining initial evidence of false advertising. The case was also difficult to litigate given Plaintiff's shoe-string budget against a better funded adversary.

40. The amount of time invested in the case, more than 1,800 hours by one attorney alone, precluded taking on many other matters or clients.

41. I took this case on contingency and also paid law students, paralegals, junior attorneys and advanced costs for the client.

42. In the end, Plaintiff obtained the litigation objective of Diestel changing its advertising campaign and specifically dropping the false animal raising claims. This benefits the public who purchases turkey products, particularly those who wish to support truly thoughtfully raised operations.

**ELSNER LAW & POLICY, LLC**

*/s/ Gretchen Elsner*
Gretchen Elsner (*Pro Hac Vice*)
314 South Guadalupe Street
Santa Fe, New Mexico 87501
Telephone: (505) 303-0980
gretchen@elsnerlaw.org

*Counsel for Plaintiff*

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Santa Fe County, New Mexico. I am over the age of eighteen (18) years and not a party to this action; my business address is 314 South Guadalupe Street, Santa Fe, New Mexico 87501.

On January 22, 2021, I served the preceding document by emailing a true and correct copy.

☐ **BY MAIL:** I caused such envelope(s) to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with Elsner Law & Policy's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Service on that same day in the ordinary course of business.

☒ **BY ELECTRONIC MAIL:** I caused said document to be transmitted to the email addresses of the addressee(s) below.

J.T. Wells Blaxter
Brian R. Blackman
Email: wblaxter@blaxterlaw.com
Email: bblackman@blaxterlaw.com
BLAXTER BLACKMAN LLP
601 California St., Suite 1505
San Francisco, California 94108

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Santa Fe, New Mexico, on January 22, 2021.

*Gretchen Elsner*
Gretchen Elsner

AA 1048



# HELGA SCHIMKAT, ATTORNEY

| DATE | HOURS | SERVICES |
|------|-------|----------|
| 11/8/18 | 5h 57m | Telephone call with Gretchen regarding status of case and work plan for today; telephone meeting update with Sonya; work with Cecile Topet on survey of turkey purchasers. |
| 11/14/18 | 26m | Take survey and send Gretchen edits. |
| 12/19/18 | 23m | Review case status emails from Gretchen. Watch video of subpoena service on Whole Foods. |
| 12/26/18 | 1h 9m | Read relevant documents to get caught up on case. |
| 12/27/18 | 31m | Continue reading Third Amended Complaint. |
| 1/3/19 | 2h 32m | Create proof chart and make list of places to check up on our evidence. Begin filling in chart from Third Amended Complaint. |
| 1/4/19 | 1h 1m | Meet with Gretchen regarding form for proof chart and syncing with Cecile's start. Go over which folders to review for potential evidentiary documents. |
| 1/7/19 | 1h 50m | Review Volume 1 Text 0005 (part of Diesel's 7th production) searching for relevant documents and tracking keywords for future searching. |
| 1/8/19 | 2h 27m | Finish reviewing Volume 1 Text 0005 (part of Diesel's 7th production) searching for relevant documents and tracking keywords for future searching. Cross-reference to image and other files. Update spreadsheet of "Hot Docs" accordingly. |
| 4/9/19 | 15m | Discuss privilege log analysis and and letter with Gretchen. |

| Date | Time | Description |
|---|---|---|
| 4/16/19 | 3h 22m | Begin analyzing Defendant's privilege log for problems. |
| 4/17/19 | 2h | Continue analyzing Defendant's privilege log. |
| 4/19/19 | 3h 37m | Draft letter to Defendant regarding issues with privilege log. |
| 5/29/19 | 4h 51m | Review and analyze Diesel's revised privilege log to determine what's changed and what hasn't. Begin draft of letter noting findings. |
| 5/30/19 | 1h 9m | Continue draft of letter. |
| 6/3/19 | 1h 5m | Finished letter and double check revised log. |

**32h 35m**