EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CYNTHIA WETZEL, on behalf of
herself and all other New Mexico
consumers similarly situated,

    Plaintiff,

vs.    NO: 20-CV-01213-JB-KRS

DIESTEL TURKEY RANCH,

    Defendant.

DEPOSITION OF CYNTHIA BOYES WETZEL
September 13, 2022
9:00 a.m.
1660A Old Pecos Trail
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: BRIAN R. BLACKMAN, ESQ.
    Attorney for the Defendant

REPORTED BY: Cynthia C. Chapman, RMR-CRR, CCR #219
    Bean & Associates, Inc.
    Professional Court Reporting Service
    201 Third Street, NW, Suite 1630
    Albuquerque, New Mexico 87102

Job No.: 7131N (CC)

## Page 2

A P P E A R A N C E S

For the Plaintiff:
   GRETCHEN ELSNER, ESQ.
   ELSNER LAW & POLICY, LLC
   314 South Guadalupe Street
   Santa Fe, New Mexico 87501
   gretchen@elsnerlaw.org

For the Defendant:
   BRIAN R. BLACKMAN, ESQ.
   BLAXTER BLACKMAN LLP
   601 Montgomery Street, Suite 1110
   San Francisco, California 94111
   bblackman@blaxterlaw.com

   QUINN S. SIMONS, ESQ.
   THE SIMONS FIRM, LLP
   1660A Old Pecos Trail
   Santa Fe, New Mexico 87505
   qsimons@simonsfirm.com

## Page 3

I N D E X

                   PAGE
EXAMINATION OF CYNTHIA BOYES WETZEL
  By Mr. Blackman                5
CERTIFICATE OF COMPLETION OF DEPOSITION   182
WITNESS SIGNATURE/CORRECTION PAGE       184

   EXHIBITS MARKED OR FORMALLY IDENTIFIED

1   DxE Report re Diestel Turkey Ranch    81
    Conditions

2   DxE Press Release re "Residue of      85
    Prohibited Antibiotic Reported in
    Diestel Turkey - USDA"

3   Diestel Turkey Ranch Poster       115
    Representation

4   Diestel Turkey Ranch Flier        116

5   Diestel Turkey Ranch Brochure Pages   117

6   Meet Our Birds Flier            123

7   Photo of Diestel Turkey Ranch Young Turkey  126
    with Giblets

8   Diestel Turkey Documentation and Images   138

9   Diestel Documentation and Images      140

10  Amazon Order Detail Page         143

11  Class Action Complaint           144

12  Heidi's Hens Brochure - Copy       169

13  Brochure, American Heirloom Collection  169
    Young Turkey, Copy

14  Brochure, Real Good Turkey, Real Family  170
    Farm - Copy

## Page 4

INDEX TO EXHIBITS MARKED OR IDENTIFIED, Continued
                             PAGE

15  Brochure, Satisfaction By The Slice -   170
    Copy

16  Channel 13 Webpage re Lawsuit       171

17  E-Mails between Ms. Wetzel and her Family  172
    Members

18  Excerpt re Lawsuit from           174
    Santa Fe New Mexican

## Page 5

           CYNTHIA BOYES WETZEL,
after having been first duly sworn under oath,
was questioned and testified as follows:
              EXAMINATION
BY MR. BLACKMAN:
   Q.  Would you please state your full name for the record?
   A.  Cynthia Boyes Wetzel.
   Q.  Good morning, Ms. Wetzel.  My name is Brian Blackman.  I introduced myself just before we started.
       I represent Diestel Turkey Ranch in the action that you filed here in New Mexico.
       We're here to take your deposition in that matter today.  I've -- it's a question and answer. I've got a number of rules I'd like to go over with you, but let's start with some preliminary.
       Have you ever gone by any other name than Cynthia Wetzel?
   A.  Cynthia Boyes.
   Q.  And how do you spell Boyes?
   A.  B-o-y-e-s.
   Q.  Any other names?
   A.  No.  Cindy.
   Q.  The court reporter has placed you under

**Page 34**

1  A. Yes.
2  Q. And can you tell me when you discussed
3  being a class representative with them?
4  A. Yes. When the newspaper article came out
5  in the Santa Fe New Mexican.
6  Q. So that was after the lawsuit was filed?
7  A. Yes.
8  Q. Do you recall if your conversations with
9  them were about what it means to be a class
10 representative? Or was it just the fact that you
11 were going to be serving as a class representative
12 in this lawsuit that the news article was covering?
13 A. Yeah. I just sent them the news article,
14 and I made a comment about what it meant. But I
15 can't remember exactly -- exactly what it was.
16 Q. I know you said you've never been deposed
17 before and that you've never been a party in a
18 lawsuit before. But have you ever had to provide
19 testimony in a lawsuit before?
20 A. No.
21 Q. You never had to testify in court?
22 A. No.
23 Q. I've already forgotten if I asked you
24 this, so I'm going to ask you this again.
25    Have you ever been asked to be a class

**Page 35**

1  representative before?
2  A. No.
3  Q. What is your understanding of what a class
4  action is?
5  A. It's when a large number of people have
6  the same complaint against a company, and, instead
7  of going individually, they come together as a group
8  to try and remedy the situation.
9  Q. And that's what you've brought against
10 Diestel in this particular action?
11 A. Yes.
12 Q. Are any of your friends class action
13 attorneys? And what I mean by that is attorneys who
14 handle, either on the defense or the plaintiffs'
15 side, class action lawsuits.
16    MS. ELSNER: Objection. Foundation.
17 A. No.
18 Q. Who represents you in the present action?
19 A. Gretchen.
20 Q. Gretchen Elsner?
21 A. Yes.
22 Q. And her law firm?
23 A. Yes.
24 Q. Okay. And how did you meet your counsel?
25 A. Through my friend.

**Page 36**

1  Q. Which friend is that?
2  A. Helga.
3  Q. What's Helga's last name?
4  A. Schimkat.
5  Q. And how did that introduction happen?
6     MS. ELSNER: Objection to the extent that
7  calls for attorney-client communications. So to the
8  extent that it's not an attorney-client
9  communication, you can answer.
10 A. Are you asking how the introduction
11 happened? Or --
12 Q. I'm trying to understand how you met your
13 counsel.
14 A. Oh. Helga introduced us.
15 Q. And did you ask Helga to introduce you to
16 an attorney?
17 A. No.
18 Q. So how did the subject come up between you
19 and Helga?
20 A. I believe Helga might have been working on
21 a case, and she was telling me about it, because we
22 are writing -- writing friends. So it just came up
23 in conversation. "Writing friends," meaning we
24 critique each other's work.
25 Q. So you said Helga may have been working on

**Page 37**

1  a case. Does she work at a law firm?
2  A. No.
3  Q. Do you know if she was serving as a class
4  representative in another lawsuit?
5  A. No. She's a lawyer.
6  Q. She's a lawyer. What kind of law does
7  Helga do, to your knowledge?
8  A. All different kinds.
9  Q. Does that include class action?
10    THE WITNESS: Oh.
11    MS. ELSNER: Objection. Foundation.
12 Q. (By Mr. Blackman) To your knowledge.
13 A. I don't think so.
14 Q. So I'm trying to understand how -- what
15 happened between you and Helga that led to the
16 introduction to your current counsel.
17    So did you go to Helga and say, "I need a
18 class action lawyer"? Or was it something else?
19 A. No.
20    MS. ELSNER: Yeah. And I'll object on the
21 basis of attorney-client privilege. So I don't know
22 how much you can answer without getting into that.
23    MR. BLACKMAN: Which attorney-client
24 privilege? I'm not asking what she discussed with
25 you. I'm asking what she discussed with Helga.

**38**

1  Q. (By Mr. Blackman) Are you represented by
2  Helga Schimkat?
3  A. No.
4  Q. So what did you discuss with Helga
5  Schimkat that led to your introduction to Elsner?
6  A. We discussed the other case that was
7  happening, the Direct Action Everywhere, I believe
8  it's called.
9  Q. Is Helga an attorney on the Direct Action
10 Everywhere case, to your knowledge?
11 A. I believe she did a little bit of work
12 with Gretchen.
13 Q. Okay. And is that the action that Direct
14 Action Everywhere brought against Diestel Turkey
15 Ranch, to your knowledge?
16 A. I believe so.
17 Q. And what did you and Helga discuss about
18 the Direct Action Everywhere case?
19 A. She told me -- she showed me the videos.
20 We talked about -- yeah. We just talked about the
21 fact that these turkeys were raised in an industrial
22 agriculture operation, even though they claimed not
23 to be.
24 Q. Did you discuss anything else with Helga
25 about the Direct Action Everywhere action?

**39**

1  A. No.
2  Q. Did Helga show you any documents other
3  than the videos?
4  A. I believe there was a news article or two.
5  Q. When you say "news article," do you recall
6  what news agency those articles were from? Like,
7  were they in the Wall Street Journal, or was it the
8  Times? Or was it something local?
9  A. I think it was Washington Post and Slate,
10 which I consider reputable.
11 Q. Sorry. The Washington Post and Slate?
12 Or --
13 A. Yes.
14 Q. Did she show you anything else?
15 A. No.
16 Q. How many videos did Helga show you?
17 A. I can't recall exactly. It -- it may have
18 just been one video. It may have been two videos,
19 I'm not sure. I can't recall.
20 Q. Can you estimate for me how long the video
21 was? Was it five seconds? Or was it a few minutes
22 long?
23 A. A few minutes, I'd say. It was a
24 significant video.
25 Q. Was this a video taken inside of Diestel's

**40**

1  farms and ranches?
2  A. Yes.
3  Q. This wasn't, like, a YouTube video that
4  Diestel put out as advertising?
5  A. No.
6  Q. Did Helga tell you who shot the video?
7  A. Yes.
8  Q. And who shot the video?
9  A. Direct Action Everywhere.
10 Q. Did she tell you who at Direct Action
11 Everywhere took the video?
12 A. No.
13 Q. Did she tell you when the video was taken?
14 A. No.
15 Q. Did she tell you where the video was
16 taken?
17 A. In the turkey barn at one of Diestel's
18 properties. But I'm not sure exactly the exact
19 location. She probably told me, but I don't
20 remember.
21 Q. Okay. Did you do any independent
22 investigation to confirm what Helga told you?
23 A. I read the news articles.
24 Q. And those were the articles by the Post
25 and Slate?

**41**

1  A. Yes.
2  Q. Did you read any other articles?
3  A. No.
4  Q. When did you have this conversation with
5  Helga? I'm sorry. Is it Schimkat? Did I write
6  that down right?
7  A. (Witness indicates.)
8  Q. When did you have this conversation with
9  Ms. Schimkat?
10 A. I believe it was 2019.
11 Q. Do you remember what time of year,
12 generally?
13 A. Summer. But I'm guessing. It may have
14 also been spring. I just remember being outside and
15 talking to her, and it was nice out.
16 Q. Was that conversation in Santa Fe?
17 A. Yes. On the telephone.
18 Q. Okay. Over the phone?
19 A. On the telephone, followed up by e-mails.
20 That's how I got the links to the article and the
21 video.
22 Q. Did you e-mail -- sorry. Strike that.
23    So you exchanged a number of e-mails with
24 Helga about the Direct Action Everywhere action?
25 A. Not a number of them. Just one.

```
                                                    42
 1      Q.  Do you still have that e-mail?
 2      A.  Yes.
 3      Q.  Have you turned it over to your counsel
 4   for production in this action?
 5      A.  Yes.
 6         MR. BLACKMAN:  Gretchen, do you have that
 7   e-mail?
 8         MS. ELSNER:  We can talk after the depo.
 9   But go ahead and ask Ms. Wetzel questions.
10         MR. BLACKMAN:  All right.  Well --
11      Q.  (By Mr. Blackman) So other than this
12   telephone conversation and the one e-mail, did you
13   have any other conversations with Ms. Schimkat about
14   the Direct Action Everywhere case?
15      A.  No.
16      Q.  Did you have any other conversations with
17   Ms. Schimkat about your -- your action against
18   Diestel Turkey Ranch?
19      A.  Yes.
20      Q.  How many conversations?
21      A.  I don't know.
22      Q.  Was it more than ten?
23      A.  No.
24      Q.  Do you recall if these were over the
25   phone?  Were they in person?  By e-mail?  How were
```

```
                                                    43
 1   you conversing with her?
 2      A.  Over the phone or in person.
 3      Q.  Do you recall meeting with Ms. Schimkat in
 4   person to discuss your action against Diestel Turkey
 5   Ranch?
 6      A.  I did not meet with her to discuss it
 7   specifically.  But it came up in conversation when
 8   we were talking about other things.
 9      Q.  When was that conversation?
10      A.  I can't remember exactly.  I see her a
11   lot.  She's my friend.
12      Q.  What did you discuss about the current
13   action?
14      A.  I can't recall exactly.  Nothing specific.
15      Q.  The video -- videos that Ms. Schimkat
16   showed you, if the conversation was over the phone,
17   how did she show you those videos?
18      A.  That's why I clarified that it was
19   followed up by an e-mail, because she sent me an
20   e-mail after -- after we talked on the phone.
21      Q.  And the e-mail included both the videos
22   and the news articles?
23      A.  Yes.
24      Q.  And it's -- what was your reaction to her
25   e-mail and attachments?
```

```
                                                    44
 1         MS. ELSNER:  Objection.  Foundation.
 2      Q.  Did you feel a reaction to -- after you
 3   read her e-mail, watched the videos, and read the
 4   news articles, did you have a reaction to it?
 5      A.  Yes.
 6      Q.  And what was your reaction?
 7      A.  I was kind of horrified.  And I wrote her
 8   an e-mail back.
 9      Q.  What did you say in your e-mail to her?
10         MS. ELSNER:  Objection.  Attorney-client
11   privilege.
12         MR. BLACKMAN:  She's already testified
13   that she's not represented by Ms. Schimkat.
14      Q.  (By Mr. Blackman) So you can go ahead and
15   answer the question.
16         MS. ELSNER:  Not to the content of the
17   communication.
18         MR. BLACKMAN:  Are you instructing her not
19   to answer?
20         MS. ELSNER:  Yes, for attorney-client
21   privilege reasons.
22      Q.  (By Mr. Blackman) Did the e-mail that
23   Ms. Schimkat sent you with the videos and law
24   articles attached -- was that one e-mail?
25      A.  Law articles?
```

```
                                                    45
 1      Q.  Sorry.  Not law articles.  The Washington
 2   Post and Slate articles, was that one e-mail?
 3      A.  Yes.
 4         MS. ELSNER:  Objection.  Mischaracterizes
 5   the testimony.
 6      Q.  It was one e-mail.
 7      A.  She sent me one e-mail.
 8      Q.  In the e-mail -- I'm just trying to get
 9   the e-mail had both the video and the newspaper
10   articles attached to it.
11      A.  Yes.
12      Q.  And is it what you learned in that e-mail
13   and its attachments that led to you bringing this
14   action against Diestel Turkey Ranch?
15      A.  No.  It's the conversation I had with her
16   before that that led to me doing this.
17      Q.  So that e-mail didn't have any impact on
18   your decision to bring this action.
19      A.  It backed up what I already believed, what
20   we talked about earlier.
21      Q.  So is it fair, then, to say that it was
22   both the conversation with Ms. Schimkat and the
23   e-mail and its attachments that led to you wanting
24   to bring this action against Diestel Turkey Ranch?
25      A.  Yes.
```

```
                                                              46
 1       Q.  And that was in 2019 sometime?
 2       A.  Yes.
 3       Q.  So after you received the e-mail and had
 4   the conversation with Ms. Schimkat, what happened
 5   next?
 6       A.  She then introduced me to Gretchen.
 7       Q.  And was that also in roughly spring-summer
 8   of 2019?
 9       A.  Yes, I believe so.
10       Q.  Could have been fall?
11       A.  It could have been fall, yeah.  It's 2019
12   sometime.
13       Q.  Okay.  Fair enough.
14           Did you have any conversations other than
15   with Ms. Schimkat and Ms. Elsner about bringing the
16   lawsuit against Diestel Turkey Ranch before you
17   filed the action?
18       A.  My parents, maybe.  I'm not -- I probably
19   told my mom, but I can't remember exactly.
20       Q.  Okay.  Did you talk to anyone else about
21   what Ms. Schimkat had told you about Diestel Turkey
22   Ranch?
23       A.  Yes.
24       Q.  Who else did you talk to?
25       A.  My friend, Roey.
```

```
                                                              47
 1       Q.  And who is Roey -- sorry.  Can you tell me
 2   her last name?  Or is Roey her last name?
 3       A.  No.  Roey is her first name.  It's short
 4   for Rosemarie.  Valim is her last name.  V-a-l-i-m.
 5   I think that's how you spell it, but I'm not
 6   100 percent on that.  It may be V-a-d-i-m.
 7       Q.  Did you talk to anyone else before filing
 8   the lawsuit?
 9       A.  My -- I'm sure I told my husband.
10       Q.  Did you talk to anyone else?
11       A.  No.
12       Q.  Your conversation with Rosemarie Valim,
13   what did you discuss?
14       A.  I discussed -- I can't recall exactly.
15   But I'm sure I just told her the general idea of the
16   fact that these very fancy, expensive turkeys were
17   not really what they proclaimed to be.
18       Q.  Okay.  So you were telling Ms. Valim about
19   Diestel Turkey Ranch.  You weren't asking Ms. Valim
20   for information about Diestel Turkey Ranch?
21       A.  Correct.
22       Q.  Other than Ms. Schimkat or Ms. Elsner, did
23   you have any conversations with anyone where you
24   were eliciting information about Diestel Turkey
25   Ranch to help you with your decision to bring this
```

```
                                                              48
 1   lawsuit?
 2       A.  No.
 3       Q.  Do you understand that there are certain
 4   duties and responsibilities that come with being a
 5   class representative in a class action?
 6       A.  Yes.
 7       Q.  What is your understanding of those duties
 8   and responsibilities?
 9       A.  My understanding is that I represent the
10   class, and that I should attend all activities such
11   as this, that I stay in touch with my lawyer, that I
12   have interest in the case, and that I am in charge
13   of any negotiating or any more agreements.  I'm not
14   sure how to word it.
15       Q.  Like, settlement?  Is that what you're
16   talking about?
17       A.  Yeah.  Yes, I guess.  No, I'm not sure.  I
18   don't know what I'm talking about.
19       Q.  In charge of negotiations.  The case can't
20   be resolved without your involvement?
21       A.  Yeah.
22       Q.  Okay.
23       A.  I'm the main point of contact for all
24   these people that have the same complaint.
25       Q.  And do you know who those people are?
```

```
                                                              49
 1       A.  I do not.
 2       Q.  So you -- one of the duties, you said, was
 3   to represent the class.  Is it your understanding
 4   that your experiences would have to be
 5   representative?  The same or generally the same as
 6   the other members of your proposed class?  Is that
 7   your understanding?
 8       A.  Yes.
 9       Q.  Do you believe that you could represent a
10   class of consumers who purchased Diestel turkey
11   products?
12       A.  Yes.
13       Q.  And why do you believe that?
14       A.  Because I purchased a Diestel turkey
15   product.
16       Q.  And do you believe that your experience in
17   purchasing the Diestel turkey products is
18   representative of the class you propose in this
19   action?
20       A.  Yes -- I.
21           MS. ELSNER:  Same objection.  Calls for a
22   legal conclusion.  But answer to your understanding.
23       A.  I believe that -- I believe that I looked
24   at the turkey, believed something, and then paid a
25   certain price based on my belief of that, and that
```

**Page 182**

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW MEXICO

CYNTHIA WETZEL, on behalf of
herself and all other New Mexico
consumers similarly situated,
        Plaintiff,
   vs.         NO: 20-CV-01213-JB-KRS
DIESTEL TURKEY RANCH,
        Defendant.
        CERTIFICATE OF COMPLETION OF DEPOSITION
   I, CYNTHIA C. CHAPMAN, New Mexico CCR #219, DO
HEREBY CERTIFY that on September 13, 2022, the
deposition of CYNTHIA BOYES WETZEL was taken before
me at the request of, and sealed original thereof
retained by:
        BRIAN R. BLACKMAN, ESQ.
        BLAXTER BLACKMAN LLP
        601 Montgomery Street, Suite 1100
        San Francisco, California 94111

   I FURTHER CERTIFY that copies of this
certificate have been mailed or delivered to all
counsel, and parties to the proceedings not
represented by counsel, appearing at the taking of
the deposition.

   I FURTHER CERTIFY that examination of this
transcript and signature of the witness were
requested by the witness and all parties present.

   On _____, a letter was mailed or
delivered to GRETCHEN ELSNER, ESQ. regarding
obtaining signature of the witness.

   I FURTHER CERTIFY that the recoverable cost of
the original and one copy of the deposition,
including exhibits, to BRIAN R. BLACKMAN, ESQ. is
$_____.
```

**Page 183**

```
   I FURTHER CERTIFY that I did administer the
oath to the witness herein prior to the taking of
this deposition; that I did thereafter report in
stenographic shorthand the questions and answers set
forth herein, and the foregoing is a true and
correct transcript of the proceeding had upon the
taking of this deposition to the best of my ability.
   I FURTHER CERTIFY that I am neither employed by
nor related to nor contracted with (unless excepted
by the rules) any of the parties or attorneys in
this case, and that I have no interest whatsoever in
the final disposition of this case in any court.


          _____
          Cynthia C. Chapman, RMR-CRR
          BEAN & ASSOCIATES, INC.
          New Mexico Certified Court Reporter #219
          License Expires: 12/31/2022










     Job No:  7131N (CC)
     Date Taken:  September 13, 2022
```

**Page 184**

```
            WETZEL v. DIESTEL TURKEY RANCH
             WITNESS SIGNATURE/CORRECTION PAGE
      If there are any typographical errors to
your deposition, indicate them below:

PAGE  LINE
_____         Change to _____
_____         Change to _____
_____         Change to _____
_____         Change to _____
     Any other changes to your deposition are to be
listed below with a statement as to the reason for
such change.
PAGE  LINE  CORRECTION         REASON FOR CHANGE
_____
_____
_____
_____
_____
     I, CYNTHIA BOYES WETZEL, do hereby certify that
I have read the foregoing pages of my testimony as
transcribed and that the same is a true and correct
transcript of the testimony given by me in this
deposition on September 13, 2022, except for the
changes made.

               _____
               CYNTHIA BOYES WETZEL

     Job No.:  7131N (CC)
     Date Taken:  September 13, 2022
     Proofed by:  PD
```

**Page 185**

```
DATE DELIVERED:_____
GRETCHEN ELSNER, ESQ.
ELSNER LAW & POLICY, LLC
314 South Guadalupe Street
Santa Fe, New Mexico 87501

RE:  WETZEL v. DIESTEL TURKEY RANCH
DEPOSITION OF:  CYNTHIA BOYES WETZEL
DATE TAKEN:  September 13, 2022

Dear Ms. Elsner:

At the time of the above deposition/sworn statement,
it was requested that the witness read and sign
his/her transcript.

_____Enclosed is your copy of the transcript with the
     original signature page.  Please ask the witness
     to read the transcript, make any corrections on
     the signature page, and return the original
     signature page to our Albuquerque office.

_____Enclosed is your copy of the transcript.  Please
     read it, note any corrections on the signature
     page, and return the original signature page to
     our Albuquerque office.  You may keep the
     transcript for your files.

_____The transcript is now ready to review.  Please
     contact our Albuquerque office, 505-843-9494, to
     make arrangements to have the transcript read
     and signed.  If you are outside the Albuquerque
     area, please call 800-669-9492.

_____The transcript is now ready for review.  Please
     remit payment in the amount of $_____ to our
     Albuquerque office.  As soon as payment is
     received, your transcript will be delivered.  If
     you choose not to pay, please contact our
     Albuquerque office, 505-843-9494, to make
     arrangements for signature.

_____Trial in this matter is set for _____.  If
     the transcript has not been read and signed
     before that date, the original will be filed
     without a signature.
```

```
 1
 2
         _____Other: The transcript of this deposition is
 3          attached to the email.  Please also find
            attached the signature-correction page for
 4          your convenience.
 5
         The New Mexico Rules of Civil Procedure provide the
 6       witness 30 days in most instances from the receipt of
         this letter to read and sign his/her transcript.  If
 7       he/she has not read and signed the transcript in that
         time, we will file the original transcript without
 8       the signature page.
 9       Sincerely,
10
         BEAN & ASSOCIATES, INC.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25       JOB NO.: 7131N (CC)
```

```
 1                RECEIPT
 2       JOB NUMBER: 7131N (CC)  September 13, 2022
 3       WITNESS NAME: CYNTHIA BOYES WETZEL
 4       CASE CAPTION: WETZEL v. DIESTEL TURKEY RANCH
 5            *************************
 6       ATTORNEY: BRIAN R. BLACKMAN, ESQ.
 7       DOCUMENT: Transcript / Exhibits / Disks / Other _____
 8       DATE DELIVERED: _____ DEL'D BY: _____
 9       REC'D BY: _____ TIME: _____
10            *************************
11       ATTORNEY: GRETCHEN ELSNER, ESQ.
12       DOCUMENT: Transcript / Exhibits / Disks / Other _____
13       DATE DELIVERED: _____ DEL'D BY: _____
14       REC'D BY: _____ TIME: _____
15            *************************
16       ATTORNEY:
17       DOCUMENT: Transcript / Exhibits / Disks / Other _____
18       DATE DELIVERED: _____ DEL'D BY: _____
19       REC'D BY: _____ TIME: _____
20            *************************
21       ATTORNEY:
22       DOCUMENT: Transcript / Exhibits / Disks / Other _____
23       DATE DELIVERED: _____ DEL'D BY: _____
24       REC'D BY: _____ TIME: _____
25
```